Suzan NORRIS, Appellant,

v.

Ross Allen PETHE, Appellee.

No. 54A01–0410–CV–454.

Court of Appeals of Indiana.

Aug. 29, 2005.

Monty K. Woolsey, Miroff, Cross & Woolsey, Indianapolis, Sarah M. Wolf, Greenfield, for Appellant.

Kurt R. Homann, Collier Homann & Siamas, LLC, Crawfordsville, for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Respondent, Suzan Norris (Mother), appeals the trial court's findings of fact and conclusions of law in post-divorce proceedings in favor of Appellee–Petitioner, Ross Allen Pethe (Father).

We affirm in part, reverse in part, and remand with instructions.

### ISSUES

Mother raises two issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion by finding Mother in contempt because her conduct following the March 27, 2002 contempt order constituted willful and intentional disobedience; and

(2) Whether the trial court erred in finding that K.P. repudiated her relationship with Father, thereby relieving him of his obligation to contribute to her college expenses.

### FACTS AND PROCEDURAL HISTORY

Father and Mother were divorced after twenty-one years of marriage pursuant to a Decree of Dissolution dated June 1, 1999. During the marriage, two children were born: K.P., born on August 16, 1984 and D.P., born on December 1, 1987. Mother received legal custody of both children, with Father to have reasonable and liberal visitation by agreement of the parties but no less than the requirements of Montgomery County Local Rule 17. Father

was ordered to pay $300 per week in child support and has always been current on this obligation.

After the divorce, Father and Mother continued to live in Lebanon, Indiana. Father exercised his visitation throughout 1999. However, after a fall break trip in October of 1999, the relationship between Father and the children appeared to deteriorate and visitation became more infrequent. By the fall of 2000, visitation was almost non-existent. Accordingly, on June 20, 2001, Father filed a Verified Affidavit for Rule to Show Cause and Application for Permanent Injunction and a Motion for Counseling. On October 11, 2001, after a hearing, the trial court found, in pertinent part, that

> [Mother], although she may have subtly influenced the children over a period of time with regard to their attitudes about visitation with their [F]ather, did not overtly intentionally or willfully interfere with the visitation with [Father]. The [c]ourt finds that the children themselves, with some complicity on the part of [Father] determined that they did not continue to visit with him. For those reasons the [c]ourt does not believe that [Mother] actively interfered and discouraged the children. The [c]ourt finds that she is not in contempt and there is no basis for a permanent injunction to issue.

(Appellant's App. p. 72). In the same Order, the trial court appointed Larry Lennon (Dr. Lennon) "to work with the family to resolve hostilities and anger that is left over from the dissolution and also visitation issues." (Appellant's App. p. 72). Thus, the trial court ordered the parties to commence a process of family counseling and mediation with the ultimate goal of reconciliation between Father and his children.

However, on January 24, 2002, Father filed a Verified Affidavit for Contempt Ci-tation, alleging that Mother intentionally disregarded the trial court's counseling order and seeking sanction. The trial court conducted a hearing on the Affidavit, and on March 27, 2002, the trial court entered its Order finding contempt and imposing sanctions. (March 27 Order). The trial court found, in pertinent part, that

> [Mother] has intentionally caused the counseling to prematurely terminate and that she has sabotaged the professional efforts of the counselor to proceed to address the issues that the [c]ourt required to be addressed. The [c]ourt finds that she directly and indirectly influenced the children creating in them an unwillingness to participate in the counseling. She has also directly and indirectly created issues which then she claims interfere with the ability of her and the children to proceed with counseling. The [c]ourt also finds that she has intentionally failed to make appointments with the counselor when requested to do so.

> The [c]ourt finds that the actions on the part of [Mother] are without excuse or justification and that she is in contempt of [c]ourt by reason of her failure to comply with the literal language of the [c]ourt order and with the failure to comply with the spirit and intention of the order.... [S]he should pay the sum of $500.00 for the use and benefit of [Father]'s attorney and she should be committed to the Montgomery County Jail for a period of thirty (30) days. The [c]ourt further finds that the thirty (30) days of jail time should be suspended on the condition that [Mother] and the children proceed to counsel as requested by Dr. Lennon and that they positively engage in the counseling, actively cooperate with Dr. Lennon and constructively participate in the counseling sessions

and continue to do so until terminated by Dr. Lennon.

(Appellant's App. pp. 75–76).

On May 14, 2002, Mother filed an Emergency Motion for Immediate Cessation of Counseling and for a Second Opinion Evaluation of How to Proceed, which was denied by the trial court without a hearing. Furthermore, on or about July 25, 2002, Father filed several petitions, including a Petition to Modify Order Regarding Payment of Counseling Expenses and a Request to Modify Support and Visitation.

Despite Dr. Lennon's initial positive report on May 16, 2002, the situation deteriorated to the point where, on August 20, 2002, Dr. Lennon sent the following facsimile message to Mother's attorney:

> [B]e advised that your client has continued to thwart and undermine our repeated attempts to facilitate reconciliation between the children and their [F]ather. I will not allow this charade to continue and I am suspending all further sessions pending direction from the [c]ourt.

(Appellee's App. p. 26). Thereafter, on September 17, 2002, Father filed a Motion for Order to Show Cause and a Petition to Terminate Support. On February 11, 2003, Mother filed a renewed request for a Second Opinion Evaluation on How to Proceed. The trial court heard evidence on all motions on February 14, June 5, June 6, July 3, October 2, and 3, 2003. On August 4, 2004, the trial court, based on this evidence, entered ninety-two findings and established the following pertinent conclusions of law:

> 4. Mother has willfully and intentionally violated this [c]ourt's order dated March 27, 2002, in that she has failed to positively engage in the counseling, has failed to actively cooperate with Dr. Lennon and has failed to constructively participate in the counseling sessions and failed to continue in such efforts

until terminated by Dr. Lennon; that her conduct in unilaterally changing counseling appointments, chiding Dr. Lennon for his counseling methods and his therapeutic techniques, persisting in allowing friends to interfere in the counseling process, and refusing to attend mediation sessions despite numerous prior notifications and efforts to accommodate her schedule, all constitute willful and intentional disregard of this [c]ourt's orders.

> 5. Mother's efforts are part of a continuing pattern of willful disobedience and disdain for the [c]ourt's authority.

> 6. That Mother's conduct from March 27, 2002, through August 19, 200[2], precisely mirrors her conduct as set forth in the above language and demonstrates a continuing pattern of disdain for this [c]ourt's authority.

> 7. For her contempt, [M]other should be required to reimburse Father for all of the counseling fees, reports and in-court testimony of Lennon and Associated in the amount o $9,250.

> . . . . .

> THEREFORE, the [c]ourt orders the following:

> 4. . . . Further, the [c]ourt now imposes seven (7) days of the thirty-day jail sentence previously imposed by Judge Milligan in his March 27, 2002 Order. Mother shall report to the Montgomery County Jail on September 14, 2004 at 10:00 a.m. to serve this sentence. The [c]ourt has converted the other twenty-three (23) days of jail time to one hundred eighty (180) hours of community service for Mother's continued failure to comply with this [c]ourt's orders. In addition, the [c]ourt orders [M]other to pay eighty percent (80%) of the fees incurred by the Guardian Ad Litem. Mother shall perform the community service under the supervision of the

Montgomery County Probation Department. This community service shall be completed within eighteen (18) months from the date of this Order.

. . . . .

(Appellant's App. pp. 37–9, 42–3).

On September 3, 2004, Mother filed a Motion to Correct Error which was granted in part by the trial court on September 23, 2004, ordering Mother to pay $8,350 to Father for the cost of counseling fees, reports and testimony for Lennon and Associates and modifying child support to $340 per week effective January 1, 2003. All other issues were denied. On September 10, 2004, the trial court granted Mother's Motion to Stay the jail sentence imposed by the trial court's Order. On October 8, 2004, Father filed a Motion to Lift Stay of Proceedings. However, on October 18, 2004, the trial court entered an order, extending the stay of Mother's jail sentence.

Mother now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. Contempt

Mother first contends that the trial court abused its discretion by finding Mother in contempt because her conduct following the March 27 Order constituted willful and intentional disobedience. The determination of whether a party is in contempt of court is a matter within the trial court's discretion and the trial court's decision will only be reversed for an abuse of that discretion. *Williamson v. Creamer*, 722 N.E.2d 863, 865 (Ind.Ct.App.2000). A court has abused its discretion when its decision is against the logic and effect of the facts and circumstances before the court or is contrary to law. *Id.* When reviewing a contempt order, we will neither reweigh the evidence nor judge the credibility of witnesses. *Id.* Our review is limited to considering the evidence and reasonable inferences drawn therefrom that support the trial court's judgment. *Id.* Unless after a review of the entire record we have a firm and definite belief a mistake has been made by the trial court, the trial court's judgment will be affirmed. *Id.* Furthermore, this court will only reverse the trial court's contempt judgment if there is no evidence to support it. *Id.*

### A. Finding of Contempt

As we stated previously, in order to be punished for contempt of a trial court's order, there must be an order commanding the accused to do or refrain from doing something. *Id.* To hold a party in contempt for a violation of a court order, the trial court must find that the party acted with willful disobedience. *Id.* Mother bears the burden of showing that her violation of the trial court's March 27 Order was not willful. *See id.* In order to avoid a direct contempt citation, the trial court, in its March 27 Order, specifically ordered Mother "and the children [to] proceed to counsel as requested by Dr. Lennon and that they positively engage in counseling, actively cooperate with Dr. Lennon and constructively participate in the counseling session and continue to do so until terminated by Dr. Lennon." (Appellant's App. p. 76).

In the instant case, Mother focuses on two lines of arguments to justify her contempt as found by the trial court. First, she alleges that constant scheduling conflicts made it difficult to comply with Dr. Lennon's scheduled appointments, but that she nevertheless never intentionally missed any scheduled appointments. As a related contention, she asserts that she has no control over the children and cannot engage them in counseling or force them to actively cooperate. Second, Mother draws our attention to her emergency orders for the appointment of another coun-

selor arguing, in essence, that Dr. Lennon is harming the children.

▮ Our review of the record shows that upon resumption of the counseling process after the March 27 Order, some initial progress was made when the children elected to meet their father in town instead of in Dr. Lennon's office. However, in his report dated May 16, 2002, Dr. Lennon noted that Mother began imposing limitations on scheduling future appointments. She cited numerous activities that the children had committed to and which she felt needed to be honored, in addition to her own commitments. As a result of this juggling of numerous commitments, Mother unilaterally changed scheduled appointments. Even though the trial court in its findings acknowledged the difficulties in scheduling, the trial court also found that the ultimate goal of these sessions were the reconciliation between Father and his children. To that end, Dr. Lennon, in several progress reports issued after the March 27 Order, recommended that "family accommodations to visitation guidelines can be made for serious family health matters, such as with their maternal grandfather, assuming that visitation with their [F]ather is given higher priority than their social, academic, and work schedules." (Appellee's App. p. 11). Nonetheless, as the summer of 2002 progressed, Mother insisted on accommodating D.P.'s tennis schedule, K.P.'s summer job, and Mother's own work schedule.

In his progress report of June 3, 2002, Dr. Lennon stated that appointment changes were to be discussed between the parents prior to any rescheduling. Mother was also encouraged to attend the counseling sessions despite her earlier claim that she had been informed not to come. The record reflects that although meetings between Father and the children continued into June, Mother did not attend. The progress which initially had been made began to deteriorate and Mother, through counsel, began to object to Dr. Lennon's therapeutic methods. The evidence clearly indicates that the children did not want to attend the counseling sessions and limited their engagement during the sessions to an absolute minimum. Their behavior resulted in Dr. Lennon's notation in his July 23, 2002 progress report that there is "absolutely no rationale for the children's refusal to have visitations with their Father or to explain the hurtfulness of their words and actions [ ] presented to him under the guise of cordiality and honesty." (Appellee's App. p. 10).

The evidence shows that the situation reached a climax in August. The record establishes that Mother attempted to unilaterally change a mediation scheduled for August 5, 2002 at which her presence was mandatory, while at the same time she eliminated all future mediation sessions for K.P. Dr. Lennon declined to reschedule the appointment and neither Mother nor the children appeared for the August 5, 2002 session. Thereafter, on August 8, 2002, Mother, through her counsel, insisted on dictating shortened mediation sessions for D.P. due to his tennis practice which "is extremely important to him." (Appellee's App. p. 19). By the same letter, Mother unilaterally terminated all further counseling with K.P. because of her upcoming college attendance.

Thereafter, a mediation session scheduled for August 19, 2002, which all parties were expected to attend, was only attended by D.P. and Father. The record establishes that on August 20, 2002 Dr. Lennon informed Mother's counsel of Mother's unexcused absence on August 19, 2002 and reported the next session to be on August 22, at 6 p.m... This letter was in addition to a voice mail left on Mother's home phone as well as oral notification to D.P. during the August 19 session. Mother's

counsel replied that neither Mother nor D.P. could attend the session due to a prior commitment and chided Dr. Lennon for unilaterally scheduling the appointment. At the receipt of the message, Dr. Lennon suspended all further sessions pending direction from the trial court.

We are not persuaded by Mother's argument that she has no control over K.P. and D.P. and cannot make them actively participate in counseling. In *MacIntosh v. MacIntosh*, 749 N.E.2d 626, 630 (Ind.Ct. App.2001), *trans. denied*, we rejected the notion that a custodial parent may justify inaction simply because a child refuses to cooperate with a visitation order. In replying to MacIntosh's arguments that the visitation order improperly directs the children's conduct, we stated that "as the parent with legal custody and authority over her minor daughters, [mother] was impliedly ordered to make reasonable efforts to ensure that the children complied with the scheduled parenting time." *Id.* Here, from the March 27 Order through the final counseling session, both K.P. and D.P. were minors. Furthermore, the record shows that during her initial meeting with Dr. Lennon, Mother indicated that she refused to force the children to counsel and that she did not see any advantages to counseling. Clearly, our established case law concludes otherwise and expects parents to control their minor child's behavior and attitude. Accordingly, we find Mother's argument to be unavailing.

Next, Mother claims that the counseling sessions were harming the children to the point where they caused D.P. to become depressed. In this regard, Mother draws our attention to Dr. Kunz's testimony establishing that the counseling sessions with Dr. Lennon were emotionally and physically damaging to the children. However, the record indicates that Dr. Lennon was aware of D.P.'s depression and anxiety and considered this to be "a very healthy sign

that he is dealing with his rejecting and dismissive behavior towards his [F]ather without just cause." (Petitioner's Exh. 9). Furthermore, for several sessions the children were accompanied to Dr. Lennon's office by Dr. Kunz and his wife instead of by their Mother. In his progress reports, Dr. Lennon clearly expressed his disapproval and characterized the interaction between the children and Dr. Kunz as "transparent hyperbolic attempts to thwart the intent of the mediation sessions: improving the relationship between the children and their [F]ather." (Appellee's App. p. 10). Despite his numerous requests to Mother to be responsible for the children's transport, Dr. Kunz and his wife continued to accompany the children to Dr. Lennon's office and console them after the session.

Based on the abundance of evidence before us, it is clear that Mother was aware of the trial court's March 27 Order and willfully chose to disobey it. Therefore, we conclude that the trial court acted within its discretion when it concluded that Mother willfully disobeyed the March 27 Order. Accordingly, we refuse to disturb the trial court's Order.

### B. *Sanction*

 Mother next asserts that the sanctions imposed for contempt of court were excessive and punitive in nature. It lies within the inherent power of the trial court to fashion an appropriate punishment for the disobedience of its order. *Williamson*, 722 N.E.2d at 867. Sanctions in a civil contempt proceeding may seek both to coerce behavior and to compensate an aggrieved party. *MacIntosh*, 749 N.E.2d at 631. "In a civil contempt action the fine is to be paid to the aggrieved party, and imprisonment is for the purpose of coercing compliance with the order." *Id.* Penalties designed to compel future compliance with a court order are consid-

ered to be coercive and avoidable through obedience. *Id.*

In the case at bar, the trial court in its March 27 Order suspended the imposed thirty (30) days of jail time on the condition that Mother and the children actively cooperate with Dr. Lennon and constructively participate in the counseling sessions. Upon the trial court's finding on August 4, 2004, that Mother failed to follow its earlier order, the trial court executed seven days of the thirty day jail sentence previously suspended, with the remaining twenty-three days converted into one hundred and eighty hours of community service. In addition, the trial court ordered Mother to reimburse Father the entire cost of counseling, imposed another eighty hours of community service, and ordered Mother to pay eighty percent of the fees incurred by the guardian ad litem.

■ Here, the imposition of the seven-day sentence and one hundred and eighty hours of community service serves the coercive purpose of Mother's compliance with the trial court's Order. Although incarceration undoubtedly has a punitive component, Mother could have avoided it by abiding to the trial court's March 24 Order. As such, the effect of the prison sentence was to coerce Mother and the children into counseling with Dr. Lennon. *See Williamson,* 722 N.E.2d at 867. Therefore, we agree with the trial court that her willful disobedience of the order resulted in the execution of the previously suspended sentence.

■ Furthermore, the trial court's Order that Mother reimburse Father's counseling fees is compensatory in nature, constituting monies spent by Father in his attempt to reconcile with his children—an attempt that was purposely undermined by Mother. Accordingly, we conclude that the trial court's award of those amounts was a "proper exercise of the court's inher-

ent authority to compensate an aggrieved party." *See MacIntosh,* 749 N.E.2d at 631.

■ However, the imposition of both the additional eighty hours of community service and payment of eighty percent of the guardian ad litem fees are inappropriate. Although both provisions serve the coercive purpose of maintaining Mother's future compliance with the trial court's Order, they cannot be avoided through obedience but instead are immediately executed. *See id.* Therefore, we reverse the trial court's Order with respect to the additional eighty hours of community service and remand to the trial court for the sole purpose to determine the proper division of the guardian ad litem fees between the parties.

## II. *Repudiation*

■ Mother next contends that the trial court erred in concluding that K.P. repudiated Father and that Father, therefore, has no duty to pay K.H.'s college expenses. Specifically, Mother argues that the evidence does not support the trial court's findings of fact and the findings do not support the judgment. We disagree.

■ In the instant case, the trial court found that "[K.P.] has rejected her Father's effort to reconcile the relationship. [K.P.] has repudiated the parent-child relationship" and concluded that K.P.'s repudiation eliminated Father's obligation to contribute to her college expenses. (Appellant's App. pp. 23, 26–27). Upon appellate review, a trial court's findings of fact and conclusions will be set aside only if they are clearly erroneous, that is, if the record contains no facts or inferences supporting them. *Clark v. Crowe,* 778 N.E.2d 835, 839–40 (Ind.Ct. App.2002). A judgment is clearly erroneous when a review of the record leaves us

with a firm conviction that a mistake has been made. *Id.* at 840. We neither reweigh the evidence nor assess the credibility of witnesses, but consider only the evidence most favorable to the judgment. *Id.*

 Indiana law recognizes that a child's repudiation of a parent—that is, a complete refusal to participate in a relationship with his or her parent—under certain circumstances will obviate a parent's obligation to pay certain expenses, including college expenses. *Bales v. Bales,* 801 N.E.2d 196, 199 (Ind.Ct.App.2004), *reh'g denied, trans. denied.* In *McKay v. McKay,* 644 N.E.2d 164, 168 (Ind.Ct.App. 1994) (citing *Milne v. Milne,* 383 Pa.Super. 177, 556 A.2d 854, 856 (1989)), this court adopted the rationale of a Pennsylvania decision which held that where a child, as an adult over eighteen years of age, repudiates a parent, that parent must be allowed to dictate what effect this will have on his or her contribution to college expenses for that child. The *McKay* court, in light of *Milne,* held that a twenty-year-old son had repudiated his father such that his father was relieved of the responsibility to pay his son's college expenses where the son consulted with his mother and stepfather on all of his college-related decisions, rejected all of his father's efforts to reconcile their relationship, and testified that he had no interest in reestablishing a relationship with his father and nothing could be done to change his mind. *McKay,* 644 N.E.2d at 166.

The record clearly shows that even though K.P.'s repudiation of her relationship with Father commenced in 2000, when she was a minor, it continued uninterrupted after she reached majority in August of 2002. Father testified that when K.P. turned seventeen, he sent flowers and a birthday check to her school. Not only did K.P. decline to accept the flowers, she tore up the check and informed him:

You're wasting your time and money. The flowers are in a trash can at school, just like our relationship. The fact that you had to manipulate around the real issues was enough to trash our relationship, and this asinine lawsuit accomplished nothing more than to seal that fact. No matter what the judge orders, he can't order my heart.

(Transcript p. 678, Volume of Exh. p. 265). As Father attempted to ensure the delivery of birthday and special occasion cards, he addressed them without a return address. However, K.P. recognized the mailing and returned all cards to sender without opening them. Besides the returned cards, Father did not receive any cards, letters, or gifts from his daughter during the year 2001.

In an effort to remain involved in his daughter's life, Father continued to attend her school activities. Nevertheless, K.P. clearly rebuffed his presence. Father testified that during a cheerleading event at a football game in the fall of 2001:

[I] sat in [the] bleachers and when [K.P.] saw me she stomped up the bleachers and stood about ten feet away from me and demanded that I leave, she can't believe I'm here, and what are you doing here. Ah, she was essentially telling me to get lost.

(Appellee's App. p. 36). Only after requesting a graduation announcement in a counseling session, Father received an invitation to K.P.'s graduation ceremony which he attended against her wishes.

At trial, Dr. Lennon confirmed that K.P. considered her dad to be a liar, somebody she could not trust, who she did not want to be involved with or attend any of her school activities. The depth of K.P.'s rejection became clear during counseling sessions with Dr. Lennon:

When we had our meetings with the dad they were, uh, very cold. There were

uh, many hurtful, hurtful statements that were made such as, I'm only here because I have to be, I don't want to be here. When I would pursue that, if your father was in the hospital or if he were dying, would you want to see him? No. Would you go to his funeral? I don't know.

(Tr. p. 26–27). At Dr. Lennon's last session with K.P. on July 22, 2002, three weeks prior to her eighteenth birthday, Dr. Lennon again explored K.P.'s feelings towards her Father. During this session, the following colloquy occurred:

She, she announced to me at the last meeting that her attorney told her not to schedule any more appointments. So, I, I said well the [c]ourt Order, as far as I know, is that we are to continue, and she just referred me to her attorney. Uh, and she made it very clear that she wants nothing more to do with her [F]ather. It was difficult to even know where she was going to be living at IU because she was very hesitant, and I said are you afraid? She said, I don't know, implying that perhaps she was. I asked about tuition, you know, is your dad, she said that would be hypocritical of me to ask my dad to pay tuition. I said, well, all right, but you don't want any contact. Your dad is more than willing to pay tuition, he's more than willing to be part of your life, and I would keep coming to that, and she would say, I don't want anything to do with him, and then she would often fault me for making it worse, but a situation that bleak, I don't know how it could've been worse.

(Tr. p. 50).

◼ Although our case law clearly establishes that a child can only repudiate a relationship with his or her parents as an adult, over the age of eighteen, here, K.P.'s behavior towards her Father, commenced as a minor, continued well after she reached majority in August of 2002. Father's only communication with K.P. after the last counseling session in July of 2002, is his receipt of K.P.'s grades for the first and second semester at Indiana University. The note accompanying the grades was limited to "here are my grades from I.U." (Tr. p. 226). Furthermore, during her testimony in July of 2003, K.P. stated

I don't have a problem sending him my grades or how I'm doing in school, I did that last semester, but like I said, I'm never going to be connected with this person. I'm never going to share the same type of love for this person. And that sounds terrible because he is my dad and no one seems to understand why, or how I can say such strong things. But everything he has done to me makes me feel this way and it sounds crazy because I mean he is my dad, but, the[ ] way I feel around him I don't think I can ever . . .

(Tr. p. 658).

◼ As we stated in *McKay*, "[w]e will not provide [a child who has repudiated his parent] with the means of inflicting yet another blow to a parent who has already suffered the deeply painful rejection of his or her child." *McKay*, 644 N.E.2d at 167 (citing *Milne*, 556 A.2d at 859–66). We explained that this child will not, in any event, be allowed to enlist the aid of the court in compelling that parent to support his or her educational efforts unless and until the child demonstrates a minimum amount of respect and consideration for that parent. *Id.* Thus, the expectation that a parent would ordinarily be inclined to contribute towards his child's college education does not continue, and should not be enforced where an adult child has repudiated his relationship with his parent. *See id.* at 168.

The record reflects that since June of 2001, Father has stood with open arms attempting to reestablish a father-daughter relationship with K.P. K.P., on the other hand, has rejected all of Father's invitations but now insists that we require Father to stand with outstretched open wallet. To put it in K.P.'s words, to require Father to pay tuition now would be "hypocritical." (Tr. p. 50). Accordingly, we find that the evidence supports the trial court's finding that K.P. has repudiated her relationship with her Father, which in turn supports the trial court's conclusion that Father's obligation to pay her college expenses is obviated. *See Bales,* 801 N.E.2d at 199.[1]

### CONCLUSION

Based on the foregoing, we find that the trial court did not abuse its discretion by finding Mother in contempt because her conduct following the March 27 Order constituted willful and intentional disobedience. However, we reverse the imposition of the additional eighty hours of community service and remand to the trial court for the sole purpose of dividing the guardian ad litem fees between the parties. Furthermore, we find that the trial court did not err in finding that K.P. repudiated her relationship with Father, and thereby we conclude that Father is relieved of his obligation to contribute to her college expenses.

Affirmed in part, reversed in part, and remanded with instructions.

MATHIAS, J., concurs.

BAKER, J., concurs in part and dissents in part with separate opinion.

BAKER, Judge, concurring in part and dissenting in part.

I concur with the majority opinion except for its conclusion with respect to the trial court's imposition on Mother of 80 hours of community service and payment of 80% of the guardian ad litem's fees. The majority accepts the trial court's imposition of the seven-day sentence and 180 hours of community service, but finds fault with the imposition of an additional 80 hours of community service and payment of 80% of the guardian ad litem's fees. I do not believe that there is a basis for drawing this line—that the trial court separated the punishment into two segments is of no moment inasmuch as an initial imposition of 260 hours of community service would have been acceptable.

The majority finds fault with the additional punishment because it concludes that Mother could not have avoided this punishment through obedience. I respectfully disagree with this conclusion. If Mother had initially obeyed the trial court's order requiring her to enter into, facilitate, and cooperate with counseling with Father and the children, then her suspended thirty-day sentence would have remained suspended. Rather than complying with the order, however, Mother continued to thwart and undermine repeated attempts by Dr. Lennon to repair the relationship between Father and the children. It is Mother's lack of obedience that led directly to the punishment at issue, and I see no reason why we should treat the trial court's imposition of a seven-day sentence and 180 hours of community service any differently from its imposition of 80 hours of community service

---

**1.** Because we find that the evidence clearly supports the trial court's finding that K.P. repudiated the relationship with the Father, we do not need to address Mother's argument that the trial court erred in concluding that the parties' Settlement Agreement is not binding on the parties.

and payment of the guardian ad litem's fees.