ATTORNEYS FOR APPELLANT

Deborah M. Agard
Daniel W. Kiehl
Law Office of Deborah M. Agard
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Scott P. Wyatt
Campbell Kyle Proffitt LLP
Carmel, Indiana



FILED
Jun 23 2015, 1:30 pm
CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

Stanley Kahn,

*Appellant-Defendant,*

v.

Beverly (Kahn) Baker,

*Appellee-Plaintiff*

June 23, 2015

Court of Appeals Case No.
29A02-1409-DR-663

Appeal from the Hamilton Superior
Court

The Honorable Daniel J. Pfleging,
Judge

Case No. 29D02-1003-DR-010248

**Vaidik, Chief Judge.**

# Case Summary

[1] Father, following divorce, was ordered to pay the remainder of his college-aged daughter's post-secondary educational expenses—including tuition and room and board—and medical expenses. The father and daughter had a serious dispute the month before the court's order, however, and thereafter the

daughter engaged in limited contact with her father—she sent him text and e-mail messages but did not speak to him on the telephone or meet with him in person for over a year. The father stopped paying his daughter's expenses. Mother filed a motion for rule to show cause in an effort to get the father to comply with the court order, and the father filed a petition to modify the court order, alleging change in circumstances—specifically, that he was relieved from paying his daughter's expenses because she had repudiated him. Following a hearing, the trial court found that the daughter had not repudiated her father, found him in contempt for failing to pay the daughter's educational and medical expenses, and awarded attorney fees to the mother. The trial court also found, however, that under the "doctrine of unclean hands" the mother was to be held liable for her daughter's room and board.

[2] On appeal, we consolidate the father's issues into the following: (1) whether the trial court erred in finding that the daughter did not repudiate her father, and that he was not, therefore, relieved of his obligation to pay the expenses specified in the Agreed Entry; (2) whether the trial court erred by holding the father in contempt for failing to pay the daughter's post-secondary educational and medical expenses; and (3) whether the trial court erred in awarding the mother attorney fees. Mother cross-appeals, presenting one issue for our review: whether the trial court erred in ordering her to pay the daughter's room and board expenses. Ultimately, we affirm the trial court's order on all of the issues challenged by the father, and reverse on the issue raised by the mother.

# Facts and Procedural History

[3] Madeline, the eldest child of Stanley Kahn ("Father") and Beverly (Kahn) Baker ("Mother"), began attending Emory University in Atlanta, Georgia, in the fall of 2009, intending to graduate with honors in December 2012.[1] In 2010, after twenty-one years of marriage, Father and Mother—who both reside in central Indiana—divorced and reached a settlement agreement ("the Settlement Agreement"), approved by the trial court on June 10, 2010. This Settlement Agreement required Father to pay Madeline's tuition for the 2010-11 school year at Emory. The Settlement Agreement also provided that Father would pay for health insurance for the parties' two children, and that all uninsured medical costs and expenses of the children were to be divided equally between the parties.

[4] In December 2011, when Madeline was home in Indianapolis for Christmas break, she and Father had a heated dispute over whether Madeline could take her car back to Atlanta.[2] Thereafter, Father went to Mother's house, where Madeline was staying, and took away the car. Madeline then went to the bank where she and Father had a joint account to withdraw funds so she could buy a new car.[3] While Madeline was at the bank, Father suddenly arrived, and

---

[1] Although the parties have two children, the expenses of the younger child are not at issue in this appeal.

[2] Madeline testified that the car was a present to her for her sixteenth birthday. *See* Tr. p. 325. But Father held title, paid insurance, and maintained the car. *See id*. at 94.

[3] The money in this joint bank account was Madeline's money from past employment, gifts, and a lawsuit settlement. *See* Tr. p. 328.

Madeline, who was "terrified," quickly left the bank to evade Father. Tr. p. 278.

[5] The next month, in January 2012, the parties entered into an agreed entry ("the Agreed Entry"), approved by the trial court, which modified Father's obligations for Madeline's post-secondary education expenses. Specifically, the Agreed Entry provided in pertinent part as follows:

> 3.      For the remainder of Madeline's undergraduate education at Emory University, which education shall be completed by December 31, 2012, . . . Father shall pay and be responsible for the following:
>
> > a.      Tuition at the institution the child attends;
> >
> > b.      Room and board at the institution the child attends;
> >
> > c.      Reasonably necessary books, fees and supplies; and
> >
> > d.      Transportation to and from school at the beginning and the end of the school year or as otherwise agreed by the parties; provided, however, that in the event Mother agrees to provide transportation to and/or from school for a child (which Mother is not obligated to do), then Mother shall pay the expenses of providing the transportation.
>
> Mother shall not have an obligation to contribute to each child's undergraduate educational expenses.
>
> 4.      Neither party shall have a child support obligation to the other. . . .
>
> > > > > * * * * *
>
> > d.      The children spend approximately half their time at the home of each parent when they are not at school.
>
> > > > > * * * * *
>
> > f.      Father is responsible for the children's uninsured health care expenses.

> g. Each parent shall pay for the care and maintenance of the children during any periods of time that the children shall be with that parent.

Appellant's App. p. 55-56.

[6] Following the dispute over the car, Madeline and Father did not speak in person or on the telephone for all of 2012—Madeline had made a "conscious decision" that she could not see or talk to Father for the time being. Tr. p. 329. As she explained:

> It was really about his presence and his voice. I was just really scared to hear him or see him because it just brought up too much, and I had physical reactions to it. I would shake and cry when I would listen to him because it would just kind of – I know it sounds cliché, but just take me back. And I still wanted to talk to him and I miss him all the time. So, I would e-mail him or, you know, send him a paper that I was working on because I really wished that he could be included in some of the stuff that was going on with me, but I just couldn't hear him or see him. It just hurt me too much and it scared me too much.

Id. at 330.

[7] Madeline came home to Indianapolis on multiple occasions in 2012 but did not see or contact Father during these visits. She did, however, send Father numerous e-cards, and e-mail and text messages. In these, she told Father that she loved him and missed him, wished him a happy birthday, shared the first paper she had ever written on a legal case, sent photos of her new apartment, and sent news about her induction into a philosophy honors society, her involvement in a play, and a new job. She also asked Father about a wedding he had attended, his new apartment, and his eye surgery. According to Father, however, "[s]ending an occasional text message or an e-mail is not a

relationship." *Id.* at 144. Regarding a February 2012 e-mail in which Madeline wrote "I really love you[,]" Father testified that those were "hollow words because there's nothing behind it. There's no action behind it." *Id.* at 186.

[8]     Father, Mother, and Madeline all intended for her to graduate with honors, which required her to take part in a two-semester honors course. Madeline's original plan was to take the first part of this course in the spring semester of her junior year and the second part in the fall semester of her senior year. To that end, in the spring semester—early 2012—Madeline was attending meetings with her professor in the belief that she was working toward her honors credit, but "there was a problem with [her] registration in the spring that [she] was unaware of, and [she] didn't receive credit for it." *Id.* at 58. Therefore, she decided to take the first part of the course in the summer of 2012 and the second part, as originally planned, during the fall semester.

[9]     But Father, who had paid Madeline's tuition, room and board, and other required fees through the spring 2012 semester, simply did not pay for any of Madeline's post-secondary educational expenses thereafter—including, most significantly, any costs associated with the summer 2012 semester. And because Madeline was not able to register for the summer semester, she needed to take the two-semester honors course in the fall 2012 semester and the spring 2013 semester in order to fulfill her plan of graduating with honors—meaning, she had to attend school beyond the December 2012 endpoint specified in the Agreed Entry. In spring 2012, Madeline also withdrew from an Introduction to Astronomy class because it appeared that she was going to receive a lower

grade in the class than she would have liked; she then took Meteorology in the fall 2012 semester in order to fulfill her science requirement. So, in spring 2013, Madeline was registered for the second part of her honors requirement and a P.E. class; but if she had been able to register for summer classes, she would have taken both of these during the fall 2012 semester and could still have graduated in December 2012.

[10] In terms of room and board expenses, Father had paid for Madeline to live in a sorority house for the spring 2012 semester; however, toward the end of the spring semester Madeline decided to leave the sorority and move into an off-campus apartment, for which Father would not pay. Madeline testified that while there was one "on[-]campus" housing option, it "wasn't the type of housing [she] was looking for at all[,]" *id.* at 62, and it was more expensive than the off-campus apartment. Madeline e-mailed Father photos of the new off-campus apartment at the end of May, and Father responded by e-mail, saying the apartment looked "so nice" and was "[d]ef[initely] something [he] would like." Appellee's App. p. 63. However, Father did not pay for Madeline to live in this apartment, claiming that the language of the Agreed Entry—"Room and board at the Institution the child attends[,]" Appellant's App. p. 55—only obligated Father to pay for an on-campus residence. *See* Tr. p. 173.

[11] In August 2012, Mother, pro se, filed a motion for contempt and emergency hearing regarding Father's failure to comply with the Agreed Entry, with respect to Madeline's educational expenses, in particular. Five days later, Father filed a petition requesting modification of the order with regard to

Madeline's educational expenses, alleging the occurrence of "[a] significant change in circumstances" that rendered Father's obligation to pay for Madeline's post-secondary education "unreasonable[.]" Appellant's App. p. 63. In October 2012, Mother, now represented by counsel, filed her amended motion for rule to show cause, alleging that Father had failed to pay for Madeline's educational expenses since the spring 2012 semester in willful violation of the Agreed Entry.

[12] In August and September, Madeline had medical problems. On August 29, Mother sent Father an e-mail requesting Father's insurance information in anticipation of a scheduled medical appointment. On September 4, Madeline sent Father a text message that read as follows:

> Thanks dad for asking about my health but I have a doctors apt here tomorrow I need to stay here and get well so I can stay in school. But I need the new insurance number the card I have doesn't work.

Appellee's App. p. 118. Father responded by text message: "The insurance is not new. It works. Call me so that we can talk." *Id*. at 119. On September 5, Mother was in Atlanta with Madeline, and when they attempted to use Father's insurance information at the doctor's office, the insurance card was declined. Mother texted Father to notify him that the card was declined. Mother also called Father from the doctor's office to notify him of the situation and ask that he try to figure out the problem with the insurance. Mother then paid for the appointment herself. Father did not see an actual copy of the medical bill until two weeks before trial, at Mother's deposition.

[13]     In December 2012, Madeline sent an e-mail to Father that read as follows:

> I was hoping that when I come back you would maybe want to go to counseling with me. We can do it in Atlanta or I can come home. I'm sorry that it has taken me this long to be ready. I feel like I just lost myself for so long . . . and I wasn't waiting for any specific amount of time to talk to you . . . I just know I feel more ready than I have before. I miss you, and want you to share in my life . . . . I hope you are well. I have been keeping tabs on you . . . . I hope this message finds you well, and that you know I am in no way trying to attack you or provoke you or hurt you. I really do want to work things out because I genuinely love and miss you . . . and I can't have one more dream about you, or look at the beach, or eat fruit and not talk to you. So, I love you. . . .

*Id*. at 115. In response, Father sent an e-mail that concluded, "When you move home in the summer, we can go to counseling. Love, Daddy[.]" *Id*. at 111.

On February 10, 2013, Father sent an e-mail to Madeline that read: "I saw this and thought of you. Lets [sic] meet when you come to town for spring break. Love, Daddy[.]" *Id*. at 100. Attached to this e-mail was a photo of a sign that read "COMING TOGETHER IS A BEGINNING . . ." *Id*. at 101. Later that month, Madeline sent another e-mail to Father that read in part as follows:

> I would like to meet you when I come home. I've been thinking a lot about you. Sorry it took me so long to e-mail you back. . . . I guess we both know the deposition is scheduled for that Monday I come home. Should we meet before then? I think it would be a good idea if Mom comes too to sort of help ease the transition. It's gonna be really hard. . . . I think we should keep e-mailing, though, between now and then, so we can feel more comfortable when the time comes. . . .

*Id*. at 99. On February 26, Madeline in an e-mail again stated that she would meet with Father but "would feel more comfortable if mom was there too for emotional support." *Id*. at 93. Father responded in a February 27 e-mail in part

as follows: "Madeline, I will meet with you, not with your mother present. Whatever needs to be discussed, will be discussed between you and I." *Id*.

[14] In May, Father attended Madeline's graduation from Emory without notifying her in advance that he was planning to do so. Following the graduation, Father stood approximately twenty feet away from Madeline, who was standing and talking with a group of people, and Madeline looked at him and then turned away. A flurry of text messages between Mother and Father followed:

> Mother: She stood there for a long time waiting for you. Why didn't u come over. . . .
>
> Father: We followed her over to the side of the building. She turned and saw me and turned her back to us. . . .
>
> * * * * *
>
> Father: We waited for her and we went to the bathroom. When we came out she was gone. She didn't call me. If she wanted me there that badly then she would have come over to me or made arrangements to see me. I came here to see her. When is she going to speak for herself. . . . I haven't heard her say one word, only you.
>
> Mother: Well I guess u didn't even tell her u were coming or u didn't text her or you didn't walk up to her before u went to the bathroom and it looked like u left to us. . . .
>
> Father: I wanted to surprise her today. . . . She never called me to ask me to come but I came anyway. . . .
>
> * * * * *
>
> Mother: U act like nothing has happened it's like u can show up graduation day after I had to go through hell to make sure she could. And call friends for witnesses and u not even care if she had money for food and shelter. And walk in graduation day and her run with open arms to you and have a party. These are my words not hers. . . .

Pet. Ex. 9, Ex. Vol. 1.

[15] At the end of May, Father e-mailed Madeline to notify her of a June 4 appointment he had scheduled with a therapist. Appellee's App. p. 87. Madeline texted back, "Yes, I'll be there." Tr. p. 137. Ultimately, Father and Madeline attended three counseling sessions together.

[16] A hearing was held on June 10, 2013, and February 11, 2014. Between those two dates, Madeline traveled to New York for five days with Father, her brother, and Father's girlfriend. Appellant's App. p. 18. Following the hearing, the trial court entered its findings of fact and conclusions of law, which provided in pertinent part as follows:

> 45. Indiana law provides that a court may enter an educational support order for a child's education at a post-secondary educational institution. [citation omitted].
>
> 46. Absent a modification of the Court's order, Father was obligated to pay 100% of Madeline's educational expenses at Emory University. [citation omitted].
>
> 47. "A trial court has the discretionary power to make a modification for child support relate back to the date the petition to modify is filed, or any date thereafter." [citations omitted].
>
> 48. Father's failure to pay for Madeline's post-secondary educational expenses for the 2012 summer session at Emory University predated Father's Petition to Modify.
>
> 49. Even assuming that a modification of the Agreed Modification Order regarding post-secondary educational expenses was warranted due to repudiation, as suggested by Father, any modification of the Court's post-secondary educational support order can only be entered retroactive to the date of filing.
>
> 50. The Agreed Modification Order neither prohibits Madeline from attending the 2012 summer session, nor relieves Father of his responsibility to pay for Madeline's post-secondary educational expenses during the 2012 summer session at Emory University.

\* \* \* \* \*

54.  The Court finds that Father's refusal to pay Madeline's post-secondary educational expenses for the summer 2012 session was a willful violation of this Court's order.

\* \* \* \* \*

56.  Father is in contempt of the Agreed Modification Order for refusing to pay Madeline's post-secondary educational expenses for the fall 2012 session at Emory University.

57.  The question of whether Father is in contempt for failing to pay for Madeline's post-secondary educational expenses at Emory University for the Summer and Fall, 2012, semester is dependent upon whether Madeline repudiated a relationship with Father, as Father suggests in his Petition to Modify the Agreed Modification Order.

\* \* \* \* \*

62.  Here, the discord that exists between Madeline and Father does not rise to the level of repudiation. . . .

\* \* \* \* \*

64.  The Court finds that as Madeline has not repudiated Father, Father's Petition to Modify should be denied.

65.  However, this Court recognizes that one seeking equitable relief must come to Court with "clean hands."  The unclean hands doctrine is an equitable tenet that demands one who seeks equitable relief to be free of wrongdoing in the matter before the court.  [citation omitted]. . .

\* \* \* \* \*

70.  It would not be equitable for Father to pay for Madeline's room and board when it was Mother who benefited exclusively from knowing where Madeline resided in Atlanta and enjoying her company in Atlanta and in Indianapolis.

\* \* \* \* \*

78.  Mother has been injured as a result of Father's contempt in that Mother, and her husband (Madeline's Step-Father), were required to provide for Madeline's post-secondary educational expenses at Emory University due to Father's refusal to do so.

79. Mother was also injured as a result of Father's contempt in that Mother was required to incur attorney fees in order to seek the Court's assistance in forcing Father's compliance with the Agreed Modification Order, as well as defending Father's Petition to Modify alleging repudiation.

80. As sanction for Father's contempt, and to bring father in compliance with the Court's order, Father shall be responsible for satisfying Madeline's tuition and student-loans for the summer and fall, 2012, and spring, 2013, in the sum of $34,596.64, including any interest or fees incurred on said loans, that were through Sallie Mae Bank, and co-signed by Madeline's Step-Father [], within thirty days of the Court Order.

81. As sanction for Father's contempt, and to bring Father into compliance with the Court's order, Father shall reimburse Mother the sum of $542.54 for Madeline's medical expenses paid by Mother between August 30, 2012 and August 23, 2013. . . .

82. As sanction for Father's contempt, Father shall be responsible for 77% of attorney fees Mother incurred due to Father's contempt and in defense of Father's Petition to Modify. Father shall pay the sum of $35,836.01 . . . .

* * * * *

90. It would not be equitable for Father to pay for Madeline's room and board when it was Mother who benefited exclusively from knowing where Madeline resided in Atlanta and enjoying her company in Atlanta and Indianapolis.

91. This Court finds that Mother shall remain responsible for Madeline's room and board for summer and fall, 2012, and spring, 2013, in the sum of $10,596.28.

Appellant's App. p. 18-25 (formatting altered).

[17] Father now appeals the denial of his August 29, 2013 petition to modify, his motion to correct error, and his motion for relief from judgment. Mother cross-appeals, challenging specifically the trial court's conclusion that Mother

remains responsible for Madeline's room and board for summer and fall 2012, and spring 2013.

# Discussion and Decision

[18] Father raises five issues on appeal, which we consolidate and restate as follows: (1) whether the trial court erred in finding that Madeline did not repudiate Father, and that he was not, therefore, relieved of his obligation to pay the expenses specified in the Agreed Entry; (2) whether the trial court erred by holding Father in contempt for failing to pay Madeline's post-secondary educational and medical expenses; and (3) whether the trial court erred in awarding Mother attorney fees.[4] Mother cross-appeals, presenting one issue for our review: whether the trial court erred in ordering her to pay Madeline's room and board expenses. We consider each issue below.

[19] But at the outset, we note that the trial court entered Trial Rule 52(A) findings of fact and conclusions of law.[5] As such, we use a two-tiered standard of

---

[4] In light of our decision regarding repudiation, we do not need to reach Father's contention that "the repudiation should have been effective when [M.K.] severed her relationship with Father in January [] 2012" rather than dating the alleged repudiation to August 2012, when he filed his petition for modification. *See* Appellant's Br. p. 23.

[5] In his brief, Father asserts that he is appealing the denial of his Trial Rule 59 and 60 motions to correct error and set aside judgment, but in substance, Father's arguments are directed toward the trial court's findings of fact and conclusions of law. Thus, we employ the "clearly erroneous" standard of review.

Father also writes in his brief that this Court reviews a trial court's decision to order the payment of post-secondary educational expenses for an abuse of discretion. Appellant's Br. p. 12 (citing *Hirsch v. Oliver*, 970 N.E.2d 651, 662 (Ind. 2012)). While we do not disagree, we note that the Agreed Entry ordering Father to pay M.K.'s post-secondary educational expenses is not at issue in this appeal; instead, the question is whether repudiation has occurred, such that Father is relieved from that obligation.

review: we determine whether the evidence supports the findings, and whether the findings support the judgment. *Lovold v. Ellis*, 988 N.E.2d 1144, 1150 (Ind. Ct. App. 2013). We neither reweigh the evidence nor assess the credibility of witnesses, but consider only the evidence most favorable to the judgment. *Lechien v. Wren*, 950 N.E.2d 838, 841 (Ind. Ct. App. 2011). The appellant must establish that the trial court's findings are clearly erroneous. *Lovold*, 988 N.E.2d at 1150. Findings are clearly erroneous when a review of the record leaves us firmly convinced a mistake has been made. *Id*. But we do not defer to conclusions of law, and a judgment is clearly erroneous if it relies on an incorrect legal standard. *Id*.

# 1. Repudiation

[20] Father argues first that the trial court erred in "denying Father's request that the trial court relieve him of his education expense obligation based on [M.K.]'s repudiation." Appellant's Br. p. 13. Repudiation is defined as a complete refusal to participate in a relationship with the parent. *Lovold*, 988 N.E.2d at 1150 (citing *Norris v. Pethe*, 833 N.E.2d 1024, 1033 (Ind. Ct. App. 2005)). Indiana law provides that a court may enter an educational support order for a child's education at a post-secondary educational institute, but repudiation of a parent by a child is recognized as a complete defense to such an order. *See* Ind. Code § 31-16-6-2(a)(1); *McKay v. McKay*, 644 N.E.2d 164, 166 (Ind. Ct. App. 1994). In *McKay*, the Court noted that there is no absolute legal duty on parents to provide a college education for their children, and adopted what was

Pennsylvania's approach at that time, stating "where a child, as an adult over eighteen years of age, repudiates a parent, that parent must be allowed to dictate what effect this will have on his or her contribution to college expenses for that child." 644 N.E.2d at 166 (quoting *Milne v. Milne*, 556 A.2d 854, 856 (Pa. Super. Ct. 1989)). A child's repudiation of a parent—that is a compete refusal to participate in a relationship with a parent—may obviate a parent's obligation to pay certain expenses, including college expenses. *See Bales v. Bales*, 801 N.E.2d 196, 199 (Ind. Ct. App. 2004), *reh'g denied*, *trans. denied*. It is well established that on appeal, we do not reweigh the evidence; instead, we consider first whether the evidence supports the findings and then whether the findings support the judgment. *See Lovold*, 988 N.E.2d at 1150. The appellant, for his part, must establish that the trial court's findings are clearly erroneous; findings are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made. *See id*.

[21] In determining what constitutes repudiation, we review Indiana caselaw on this issue. A finding of repudiation is fact sensitive. In *McKay*, this Court held that a twenty-year-old son had repudiated his father such that his father was relieved of the responsibility to pay his son's college expenses where the son consulted with his mother and stepfather on all of his college-related decisions, rejected all of his father's efforts to reconcile their relationship, and testified at trial that he "was electing not to have a relationship with [his] Father, that he did not want a relationship or contact with [his] Father, and there was nothing that could be done to change his mind." 644 N.E.2d at 166. In *Norris*, this Court affirmed

the trial court's finding of repudiation where a daughter admitted she "d[idn]'t want anything to do with [her father]," declined to accept birthday and special occasion cards in general, asked her father to leave a school activity, and discarded flowers and a check the father had sent to her, informing him, "You're wasting your time and money. The flowers are in a trash can at school, just like our relationship. . . . No matter what the judge orders, he can't order my heart." 833 N.E.2d at 1034, 1033. In *Scales v. Scales*, we affirmed repudiation of a Mother where the last time she had seen her daughter was six months before the hearing in a meeting that had been confrontational and intimidating to the mother, and in a telephone conversation a few days before the hearing, her son had told her, "I hate you you f***ing b****. I hope you die." 891 N.E.2d 1116, 1120 (Ind. Ct. App. 2008). In *Lechien v. Wren*, this Court affirmed the trial court's finding of repudiation in the case of a son whose only communication with his father for over a year was when he went to his father's workplace to ask for money, who had not acknowledged Father's Day or his father's birthday for several years, and had as an adult petitioned to have his last name changed to his mother's maiden name, even after acknowledging at the hearing on the name-change petition that by changing his name a judge could later decide that he had repudiated his father and did not want any help from his father. 950 N.E.2d 838 (Ind. Ct. App. 2011). And in *Lovold*, we affirmed the trial court's determination of repudiation where a son and his father became estranged post-divorce and had no contact for eight years, the son had never sent Father's Day or birthday cards or kept his father abreast of his grades, activities, or progress, and the son's claim in an in-camera interview

that he was interested in having a relationship with his father "r[ang] hollow" and appeared "chiefly motivated by the fact Mother is now requesting Father to pay [the son's] college expenses." 988 N.E.2d at 1147.

[22] In this case, by contrast, the findings showed that Father and Madeline had a close relationship for most of Madeline's life and that Father was complying with the order to pay for all of Madeline's post-secondary education expenses, but that the two had a falling out in December 2011 when Madeline wanted to take her car back to Atlanta after her Christmas break. *See* Appellant's App. p. 13, 14. Thereafter Madeline and Father did not see one another or speak on the telephone for over a year, but Madeline sent numerous e-cards, texts, and e-mail messages telling Father she loved and missed him, sharing updates about her life, and asking Father about developments in his life. *See id*. at 15. Father continued paying Madeline's expenses through the Spring 2012 semester. *See id*. at 16. In December 2012, Madeline expressed an interest in going to counseling with Father. *See id*. at 17. In February 2013, Madeline said she would meet with Father in person but would feel more comfortable if Mother was present for emotional support; Father responded that he would not meet with Madeline if Mother was there as well. *See id*. The trial court found that Madeline and Father attended three counseling sessions together and traveled to New York for five days after the first hearing on the pending motions. *See id*. at 18. Given this evidence, we find that the trial court's findings amply support the conclusion that the discord that existed between Madeline and Father did

not rise to the level of repudiation so as to obviate Father's obligation to pay the expenses specified in the Agreed Order. *See id*. at 21.

## 2. Father's Contempt and Madeline's Expenses

[23] Father next contends that the trial court erred by holding him in contempt for failing to pay Madeline's college and medical expenses. The determination of whether a party is in contempt of court is generally a matter within the sound discretion of the trial court. *See Hancz v. City of S. Bend*, 691 N.E.2d 1322, 1324 (Ind. Ct. App. 1998). Here, again, the trial court entered findings of fact and conclusions of law thereon; thus, we must determine whether the findings and conclusions are sufficient to support the judgment that Father was in contempt of the Agreed Entry. *See id*. Indirect contempt, or civil contempt, is the willful disobedience of any lawfully entered court order of which the offender has notice. *Winslow v. Fifer*, 969 N.E.2d 1087, 1093 (Ind. Ct. App. 2012), *reh'g denied*. The objective of a contempt citation is not to punish but to coerce action for the benefit of the aggrieved party. *Id*. Thus, any type of remedy in civil contempt proceedings must be coercive or remedial in nature. *Id*.

[24] First, Father contends that the trial court's sanction of ordering him to pay Madeline's expenses for the spring 2013 semester was an impermissible modification of the parties' agreement, which "required Madeline to finish her undergraduate degree by December 31, 2012." Appellant's Br. p. 25. But the evidence showed, and the trial court found, that Father had failed to pay Madeline's post-secondary educational expenses for both the summer and fall

semesters of 2012, in willful violation of the Agreed Entry. Specifically, the trial court set forth the following conclusions of law:

> 50. The Agreed [Entry] neither prohibits Madeline from attending the 2012 summer session, nor relieves Father of his responsibility to pay for Madeline's post-secondary educational expenses during the 2012 summer session at Emory University.
>
> 51. The Agreed [Entry] provides that Father is responsible for all of Madeline's post-secondary educational expenses at Emory University.
>
> * * * * *
>
> 54. The Court finds that Father's refusal to pay Madeline's post-secondary educational expenses for the summer 2012 session was a willful violation of this Court's order.
>
> * * * * *
>
> 78. Mother has been injured as a result of Father's contempt in that Mother, and her husband (Madeline's Step-Father), were required to provide for Madeline's post-secondary educational expenses at Emory University due to Father's refusal to do so.
>
> * * * * *
>
> 80. As sanction for Father's contempt, and to bring Father into compliance with the Court's order, Father shall be responsible for satisfying Madeline's tuition and student-loans for the summer and fall, 2012, and spring, 2013, in the sum of $34,596.64, including any interest or fees incurred on said loans . . . .

Appellant's App. p. 20-24.

[25] Father's argument that "the trial court impermissibly modified [the Agreed Entry] to carry forward Father's obligation for an additional semester" is unavailing for two reasons. Appellant's Br. p. 27. The first is that this does not address the fact that Father failed to pay for Madeline's summer 2012 semester—meaning she was not able to register and receive credit for summer-semester classes, *see* Tr. p. 59—although that was well within the timeframe

contemplated in the Agreed Entry and before Father filed his Petition to Modify; and the second reason, which follows from the first, is that if he *had* paid for the summer 2012 semester, Madeline *would* have been able to graduate in December 2012, as originally planned. Thus, we find that the trial court did not err in finding Father in contempt for failing to pay Madeline's education expenses for the summer and fall 2012 and spring 2013 semesters.

[26] Father also disputes the trial court's finding that he was in contempt for failing to pay Madeline's medical expenses. Although the trial court did not make any findings of fact on the issue of Madeline's unpaid medical expenses, the court nonetheless concluded that "[a]s a sanction for Father's contempt, and to bring Father into compliance with the Court's order, Father shall reimburse Mother the sum of $542.54 for Madeline's medical expenses paid by Mother . . . ." Appellant's App. p. 24. It is undisputed that the Agreed Entry provides: "Father is responsible for the children's uninsured health care expenses." *Id*. at 56. In his brief Father insists that he received the medical bill only a few weeks before trial; but there is evidence in the record that both Mother and Madeline contacted Father for updated insurance information at or around the time the medical bill was incurred, as his insurance card had been declined. *See, e.g.*, Appellant's App. p. 367; Appellee's App. p. 84, 118. However, we do not reweigh the evidence on appeal. Given that Father concedes that he is ordered to pay all of the children's uninsured medical expenses, we find that the trial court did not err in holding Father responsible for this expense.

# 3.  Mother's Attorney's Fees

[27]  Next Father contends that the trial court erred in ordering Father to pay 77% of Mother's attorney's fees.  Here the trial court made the following findings and conclusions on the issue of attorney's fees:

> 44.  Mother incurred attorney fees and expenses totaling $46,540.27 for Mother's Verified Motion for Rule to Show Cause and Father's Petition to Modify.
>
> * * * * *
>
> 52.  Mother attempted to avoid pursuing a contempt citation against Father by first requesting that Father bring himself into compliance with the Agreed [Entry] and pay the expenses associated with Madeline's enrollment in the 2012 fall semester at Emory University.
>
> 53.  Despite Mother's efforts to get Father to comply with the Court's order, Father refused to pay for Madeline's post-secondary educational expenses at Emory University.
>
> * * * * *
>
> 82.  As sanction for Father's contempt, Father shall be responsible for 77% of attorney fees Mother incurred due to Father's contempt and in defense of Father's Petition to Modify. . . .

Appellant's App. p. 19.  Ultimately, the trial court ordered "that as a sanction for Father's contempt, Father shall be responsible for $35,836.01, or 77% of attorney fees Mother incurred due to Father's contempt and in defense of Father's Petition to Modify . . . ."  *Id*. at 26.

[28]  The trial court has inherent authority to award attorney's fees for civil contempt.  *Winslow*, 969 N.E.2d at 1093.  In other words, no statutory sanction is needed, as a court's power to enforce compliance with its orders and decrees duly entered is inherent.  *Crowl v. Berryhill*, 678 N.E.2d 828, 831 (Ind. Ct. App.

1997).  Accordingly, apart from any statutory authority, a court has the inherent authority to enforce its orders and to compensate the aggrieved party for losses and damages resulting from another's contemptuous actions.  *Id.* at 832.

[29]  Here, Father argues that the trial court erred by failing to consider evidence of the parties' resources, ability to pay, and employment.  But given that Mother's request for attorney's fees was based on Father's misconduct for failure to comply with the Agreed Entry, and given the trial court's inherent authority to award attorney's fees for civil contempt, *Winslow*, 969 N.E.2d at 1093, we cannot say the trial court erred in ordering Father to pay a percentage of Mother's attorney's fees.

# 4.  Madeline's Room and Board Expenses

[30]  Last, Mother raises one issue on cross-appeal, which is whether the trial court erred in finding that it would be inequitable for Father to be responsible for Madeline's room and board after she moved out of the sorority house.  Mother does not challenge the trial court's findings of fact; instead, she asserts that the trial court clearly erred by concluding that Mother should be responsible for Madeline's room and board expenses for the 2012 summer and fall semesters and the 2013 spring semester on purely equitable grounds, namely that she "did not come to Court with clean hands."  Appellant's App. p. 24.  On appeal, we will not reweigh the evidence nor assess the credibility of the witnesses; instead, we determine whether the evidence supports the findings, and whether the

findings support the judgment. *Lovold*, 988 N.E.2d at 1150. We do not defer to conclusions of law. *Id.*

[31] The unclean-hands doctrine is an equitable tenet that demands one who seeks equitable relief to be free of wrongdoing in the matter before the court. *Coppolillo v. Cort*, 947 N.E.2d 994, 1000 (Ind. Ct. App. 2011) (citing *Fairway Developers, Inc. v. Marcum*, 832 N.E.2d 581, 584 (Ind. Ct. App. 2005), *trans. denied*.). The purpose of the unclean-hands doctrine is to prevent a party from reaping benefits from his or her misconduct. *Id.* For the doctrine of unclean hands to apply, the alleged wrongdoing must be intentional and must have an immediate and necessary relation to the matter being litigated. *Id.* The doctrine of unclean hands is not favored by the courts and must be applied with reluctance and scrutiny. *Id.* (citing *Wagner v. Estate of Fox,* 717 N.E.2d 195, 202 (Ind. Ct. App. 1999)).

[32] With respect to this issue, the trial court issued the following conclusions of law:

> 65. [] [T]his Court recognizes that one seeing equitable relief must come to Court with "clean hands". The unclean hands doctrine is an equitable tenet that demands one who seeks equitable relief to be free of wrongdoing in the matter before the court. *Fairway Developers, Inc. v. Marcum*, 832 N.E.2d 581, 584 (Ind. Ct. App. 2005), *trans. denied*. The alleged wrongdoing must have an immediate and necessary relation to the matter being litigated. *Id.* For the doctrine of unclean hands to apply, the misconduct must be intentional. *Id.* The purpose of the unclean hands doctrine is to prevent a party from reaping benefits from his misconduct. *Id.* at 585.
>
> * * * * *

69. During 2012, Madeline lived in a location in Atlanta that was unknown to Father. Madeline chose to notify Mother exclusively regarding the location of her apartment.

70. It would not be equitable for Father to pay for Madeline's room and board when it was Mother who benefited exclusively from knowing where Madeline resided in Atlanta and enjoying her company in Atlanta and Indianapolis.

* * * * *

84. The Court finds that Madeline and Mother bear some of the fault for the deteriorating relationship between Madeline and Father and thus did not come to Court with clean hands.

85. Madeline made no attempt to have a relationship with her Father except for a few text messages and e-mails.

* * * * *

88. Madeline invited Mother to Atlanta for family occasions but did not invite Father.

89. Father did not know where Madeline lived in Atlanta when she moved out of the sorority in April, 2012.

90. It would not be equitable for Father to pay for Madeline's room and board when it was Mother who benefitted exclusively from knowing where Madeline resided in Atlanta and enjoying her company in Atlanta and in Indianapolis.

91. This Court finds that Mother shall remain responsible for Madeline's room and board for summer and fall, 2012, and spring, 2013, in the sum of $10,596.28.

Appellant's App. p. 22-25.

[33] Here, Mother asserts, and we agree, that the trial court made no specific findings about any intentional misconduct on Mother's part. And indeed, we can find nothing in the record that supports the conclusion that Mother committed any acts of intentional misconduct. We acknowledge that Mother visited Madeline in Atlanta and that Madeline stayed exclusively with Mother

when she was home in Indianapolis. But we cannot imagine faulting Mother for the fact that Madeline preferred to spend time with her rather than with Father, and we find no evidence to support the conclusion that Mother bore "some of the fault for the deteriorating relationship between Madeline and Father." Appellant's App. p. 24.

[34] As to Father's knowledge of Madeline's housing: we acknowledge that Madeline did not invite Father to visit her off-campus apartment, and that she was not entirely forthcoming with information about her housing. But she did notify Father that she was moving out of the sorority house to an off-campus apartment, and she sent photos of the apartment to Father. *See* Appellee's App. p. 149, 163-66. Father, for his part, responded that "[t]he apt. looks so nice. The faucet looks very hot and cool (LOL)[.] Def something I would like." *Id*. at 149. There is no evidence that Father ever questioned her housing choice or communicated to her that he would not pay for her to live in off-campus housing.

[35] The Agreed Entry clearly states that Father is responsible for housing. There is no distinction made in the language of the Agreed Entry between on- vs. off-campus housing, as Father contends. Given that the trial court found—and we affirm—that Madeline's behavior did not rise to the level of repudiation, we conclude that Father remains liable for that expense. And because we find no evidence whatsoever that Mother engaged in any acts of intentional misconduct regarding Father's knowledge of or access to Madeline's housing, we respectfully disagree with the trial court's use of the equitable doctrine of

unclean hands in this context. We conclude that Father remains liable for Madeline's room and board for the summer and fall semesters of 2012, and the spring 2013 semester.

Affirmed in part and reversed in part.

Kirsch, J., and Bradford, J., concur.