# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**WILLIAM A. GOEBEL**
Goebel Law Office
Crawfordsville, Indiana

ATTORNEYS FOR APPELLEE:

**MONTY K. WOOLSEY**
**JONATHAN R. DEENIK**
Cross, Pennamped, Woolsey & Glazier, P.C.
Carmel, Indiana

**FILED**
Apr 26 2013, 9:28 am
**CLERK**
of the supreme court,
court of appeals and
tax court

## IN THE
## COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| SHARI (ELLIS) LOVOLD, | ) | |
| | ) | |
| Appellant/Cross-Appellee, | ) | |
| | ) | |
| vs. | ) | No. 54A01-1209-DR-410 |
| | ) | |
| CLIFFORD SCOTT ELLIS, | ) | |
| | ) | |
| Appellee/ Cross-Appellant. | ) | |

APPEAL FROM THE MONTGOMERY SUPERIOR COURT
The Honorable Justin H. Hunter, Special Judge
Cause No. 54D01-0301-DR-00015

**April 26, 2013**

**OPINION - FOR PUBLICATION**

**ROBB, Chief Judge**

Shari (Ellis) Lovold ("Mother") appeals the trial court's order denying her request for contribution from Clifford Ellis ("Father") towards the college expenses of their son, C.E. She raises the issue of whether the trial court abused its discretion by finding that C.E. repudiated his relationship with Father. On cross-appeal, Father appeals the trial court's order modifying child support. He raises the issue of whether the trial court erred in its child support calculation by requiring him to pay child support for the time C.E. lived on campus. Concluding that the trial court did not abuse its discretion with regard to the repudiation finding but that it erred in the child support calculation, we affirm in part, reverse in part, and remand.

## Facts and Procedural History

Father and Mother were divorced in 2003. Mother was granted custody of C.E., who was eleven years old at the time, and Father was granted reasonable visitation and ordered to pay child support. In 2004, child support was modified to $150 per week. Father consistently paid child support throughout the years.

In 2011, Mother filed a petition for contribution to post-secondary education expenses against Father. In turn, Father filed a petition for emancipation and for modification of child support. Mother later filed her own petition to modify child support.[1] Mother agreed that she would not file an affidavit for contempt if Father paid $60 per week in child support while C.E. was away from home for college until the court issued its ruling on the motions.

---

[1] Both parties also filed affidavits for contempt. However, the trial court's ruling on those affidavits is

A hearing was conducted on November 16, 2011, an in camera interview took place with C.E. on November 23, 2011, and, several months later, after Father filed a verified motion to re-open evidence and request for hearing, a second hearing took place on May 17, 2012. On June 26, 2012, the trial court issued its order denying Mother's request for contribution to post-secondary education expenses because it found C.E. had repudiated his relationship with Father. The trial court based its repudiation finding, in pertinent part, on the following findings of fact:

3. The October 27, 2004 Order directed the parties to attend one counseling session with the minor child to attempt to work out any differences, to reinstitute a positive parenting time experience for the minor child, and improve communication between the parties. Mother, as the custodial parent, has never scheduled this ordered counseling session.

4. Father exercised post-Decree visitation with [C.E.] for approximately nine months, though parenting time exchanges became increasingly more hostile and difficult over time. [C.E.] was having difficulty adjusting to the post-divorce changes, including parenting time and a new Step-Mother.

5. This culminated during a visit on March 31, 2004, during which [C.E.] began crying and told his Father that he wanted to go home. Father complied and, at the exchange, he told [C.E.], in the presence of his Mother, "If you want to see me, call me, you know where I am". [C.E.] agreed this is basically what happened.

6. Father has not seen [C.E.] for more than eight years. After the divorce, Mother moved in with her mother. Then, after the 2004 Order was entered, she moved again without providing Father her and [C.E.]'s new address and contact information despite Father's repeated unanswered calls requesting this information. Neither Mother nor [C.E.] communicated with Father about anything during the past 8 years and Father has been precluded from doing so with them by their failure to respond.

7. Father was surprised to learn for the first time, in Court, that [C.E.] has undergone eleven surgeries over time for his congenital cleft palate. Mother never advised him of this. [C.E] has never sent a Father's Day or birthday card to his Father nor has he ever called him to say hello or to wish him well on special occasions, despite knowing Father's address and contact

not at issue on appeal.

3

information. Father did not see [C.E.] at either of the funerals for [C.E.]'s paternal grandparents.

8. Father has not been kept abreast of [C.E]'s grades, activities, or his progress during the past seven years. As of the hearing on 11/16/11, Father still had not received any contact information for [C.E.], required by the Decree, the Order on October 27, 2004 and the Parenting Time Guidelines.

9. Although [C.E.] turned 18 in May, 2010, he has continued to choose not to communicate with his Father or send him a single card, call him, or otherwise treat him as his Father. [C.E.] confirmed that he saw his Father at a Culver's restaurant, where [C.E.] worked, but that he chose not to approach him or talk to him, even though [C.E.] was not working at the time. Instead, [C.E.] walked the other way.

10. Despite Father's willingness for years to maintain a relationship with [C.E.], all [C.E.] appears to be requesting is his Father's payment of college expenses. At the same time, neither [C.E.] nor his Mother ever discussed with Father the college [C.E.] would attend, nor how it will be paid (though it appears [C.E.] could have accepted financial aid covering almost all of his expenses).

11. During the In Camera interview on November 23, 2011, [C.E.] told the Court he is interested in having a relationship with his Father. This rings hollow and is highly suspect in light of the one and one-half years that had then passed since [C.E.] turned 18, and the prior five and one-half years, without any attempts by [C.E.] to visit his Father. This purported change of heart by [C.E.] appears chiefly motivated by the fact Mother is now requesting Father to pay [C.E.]'s college expenses and because [C.E.] is likely aware of the consequences that follow a finding of repudiation. [C.E] testified on May 17, 2012, that he had spoken with Mother's Counsel prior to coming to Court.

12. [C.E.]'s professed desire to now have a relationship with his Father also rings hollow in light of what transpired after the In Camera Interview.

13. On December 6, 2011, Father was advised by his counsel that the Judge relayed to Counsel what transpired during the In Camera Interview and that [C.E.] expressed a desire to have a relationship with his Father. As a result, Father sent a certified letter to Mother requesting contact information.

14. Because Mother never responded to Father, his Counsel sent an e-mail to Mother's Counsel on December 20th requesting the same information. On January 3, 2012, Mother's counsel advised, by e-mail, that since [C.E.] is 19 years old, Mother feels she should step out of this matter and allow [C.E.] to communicate directly with Father and that Mother had given [C.E.] Father's request for contact information.

15. Despite this, [C.E.] did not provide contact information to his Father until January 2, 2012, when he also advised that he is home on some weekends.

[C.E.]'s college, ISU, is only about an hour away from his Father's residence, but he has been unable to manage to spend any time with his Father, even over his extended break during Christmas.

16. [C.E.] testified during the hearing on May 17, 2012, that he did not contact his Father after the November 23, 2011 In Camera interview until January 2, 2012, because he did not want to meet with his Father until a decision was first entered by the Judge.

17. [C.E.] testified that he was home on 5 different weekends during the second semester. In contradiction, he also testified that he has not been able to arrange contact with his Father because he was too busy with his part-time work, starting up a fraternity, his studies, school projects, and other stuff. Though Father was not informed, as usual, a statement from his medical insurance provider covering [C.E.] shows that [C.E.] was home for a doctor appointment on December 22, 2011.

18. A review of the multiple e-mails between Father and [C.E.] from January 4 through February 26, 2012, establish that Father did arrange on several occasions to meet and have contact but [C.E.] always ultimately had an excuse, after the fact, for not having been able to do so, even after having agreed to the arrangements made by his Father. They also establish that [C.E.] was very vague in his e-mails, promising to "possibly meet this weekend" while also advising that he would let his Father know when he would be home and available to meet with him. This pattern was repeated by [C.E.] over and over again. It is for this reason Father only found it necessary to initiate the e-mails on three occasions.

19. Father testified that he did not respond to [C.E.]'s e-mails about spring break (March 5-9) because by that time he had it with [C.E.]'s repetitive false promises and excuses and he felt that "he had been played."

20. As of the hearing on May 17, 2012, six months after telling the Judge he wanted to have a relationship with his Father, [C.E.] still had not met with his Father even one time. Despite Father's wishes, he and [C.E.] have not spent any time together since March 31, 2004.

21. [C.E.], as an adult child has voluntarily made choices about the priorities in his life precluding him from purportedly being available to visit with his Father. [C.E.] should been [sic] held accountable for the consequences of his own actions.

Appellant's Appendix at 18-23 (internal citations omitted).[2] The trial court also addressed

the modification of child support issue in its order:

---

[2] The trial court also noted that even if it had not found that C.E. repudiated his Father, it would

5

> Attached is a worksheet using $2,308 per week as Father's income and $330 per week for Mother . . . . This results in a child support obligation while [C.E.] is in college in the amount of $177.46 per week. Mother has submitted a worksheet showing her belief that [C.E.] will be home for 16 weeks out of the year.

Id. at 26. Because the child support calculation of $177.46 did not significantly deviate from the $150 ordered in 2004, the trial court did not modify child support.[3]

Father filed a motion to correct error. The only aspect of the trial court's order he challenged was the child support calculation. He did not dispute the court's determination of the parties' incomes, but noted that while the trial court stated that C.E. would only be home sixteen weeks out of the year in its order, the post-secondary education worksheet used in the calculation actually included thirty-six as the number of weeks C.E. would be at home. In light of the fact that Father had been paying only $60 per week since the time C.E. started college, as agreed upon by the parties, he requested that the court correct this error to preclude Mother from later claiming that Father owed her the difference between $150 and $60 in arrearage. If the thirty-six weeks were changed to sixteen weeks, the resulting child support calculation would be approximately $79 per week and Father would only owe the difference between $79 and $60 in arrearage. Mother filed her own motion to correct error, arguing that in light of the repudiation finding, the court should not have used a post-secondary education worksheet. She proposed using a child support obligation worksheet

---

exercise its discretionary authority and deny the request for Father to contribute towards C.E.'s college expenses under the facts of this case.

[3] The court also found that the child support obligation terminated on July 1, 2012. Neither party takes issue with this date.

6

and calculating child support as if C.E. would be home year round, which would result in a child support calculation of $202.84 per week and an arrearage in the amount of $5,999.28 owed to her.[4] The trial court issued an order denying Father's motion to correct error and granting Mother's motion to correct error with regard to the child support calculation. Mother now appeals and Father cross-appeals. Additional facts will be provided as necessary.

Discussion and Decision

I. Standard of Review

A trial court's decision to deny college expenses is reviewed for an abuse of discretion. Boruff v. Boruff, 602 N.E.2d 180, 182 (Ind. Ct. App. 1992). A decision to grant or deny a motion to correct error and decisions regarding child support, such as modification of child support, are also reviewed for an abuse of that discretion. Bales v. Bales, 801 N.E.2d 196, 198 (Ind. Ct. App. 2004), trans. denied. An abuse of discretion occurs when a trial court's decision is against the logic and effect of the facts and circumstances before the court or if the court has misinterpreted the law. Id. When reviewing a decision for an abuse of discretion, we consider only the evidence and reasonable inferences favorable to the judgment. Id.

Also, when a trial court enters findings of fact and conclusions of law, we determine whether the evidence supports the findings, and whether the findings support the judgment.

---

[4] This sum is the difference between $202.84 and $60 over the course of forty-two weeks—from September 16, 2011, (the date Father started paying the reduced amount of $60) until July 1, 2012, (the date the court found child support terminated).

7

Freese v. Burns, 771 N.E.2d 697, 700 (Ind. Ct. App. 2002), trans. denied. The appellant must establish that the trial court's findings are clearly erroneous. Id. at 701. Findings are clearly erroneous when a review of the record leaves us firmly convinced a mistake has been made. Id. However, we do not defer to conclusions of law, and a judgment is clearly erroneous if it relies on an incorrect legal standard. Id.

## II. Repudiation

Indiana law provides that a court may enter an educational support order for a child's education at a post-secondary educational institute. Ind. Code § 31-16-6-2(a)(1). Repudiation of a parent by the child, however, is recognized as a complete defense to such an order. McKay v. McKay, 644 N.E.2d 164, 166 (Ind. Ct. App. 1994). In McKay, the court noted that there is no absolute legal duty on parents to provide a college education for their children, and adopted Pennsylvania's approach, stating "where a child, as an adult over eighteen years of age, repudiates a parent, that parent must be allowed to dictate what effect this will have on his or her contribution to college expenses for that child." Id. Repudiation is defined as a complete refusal to participate in a relationship with the parent. Norris v. Pethe, 833 N.E.2d 1024, 1033 (Ind. Ct. App. 2005). The focus should be on the child's behavior as an adult:

> we certainly will not consider pre-majority attitudes and behavior, as we all recognize that the maturity and restraint which can be expected of adults is not appropriately applied to evaluate children. But to extend this parental amnesty beyond the age of majority would be irresponsible.
> By college age, children of divorced parents must be expected to begin to come to terms with the reality of their family's situation. They must begin to realize that their attitudes and actions are their individual responsibilities.

8

Whatever their biases and resentments, while one can understand how they got that way, when they become adults it is no longer appropriate to allow them to stay that way without consequence.

McKay, 644 N.E.2d at 167 (quoting Milne v. Milne, 556 A.2d 854, 861 (Pa. Super. Ct. 1989), appeal denied, abrogated on other grounds by Blue v. Blue, 616 A.2d 628, 633 (Pa. 1992)). Thus, because the father in McKay had "stood with open arms" to reestablish a relationship with his son, and all his son wanted was "a court order requiring Father to stand with [an] outstretched, open wallet," the court relieved the father of the responsibility of contributing to his son's college education. Id. at 168.

Mother challenges the trial court's finding that C.E. repudiated his relationship with Father. She claims the trial court relied on erroneous findings of fact. In essence, she argues that it was Father who did not schedule a court ordered counseling session, it was Father who refused to take Mother's calls, and it was Father who failed to exercise his right to see C.E. and not the other way around. This is essentially an attempt to re-argue her case and an invitation for us to re-weigh the evidence, which we cannot do on appeal. See Staresnick v. Staresnick, 830 N.E.2d 127, 131 (Ind. Ct. App. 2005). Even if there is evidence in the record supporting her contentions, there is also evidence supporting the trial court's findings in favor of Father, and thus those findings are not clearly erroneous. We also note that Mother only points to four allegedly erroneous findings, and does not contend that the remaining findings are not supported by the evidence. The remaining findings of fact are sufficient to support the trial court's judgment.

A review of the evidence most favorable to the judgment in this case indicates that after an unpleasant visit in 2004, when C.E. was eleven years old, Father did not see C.E. for eight years. C.E. did not contact Father in any way nor did he inform him of his grades, activities, or health issues. The trial court found that this behavior continued after C.E. turned eighteen in May 2010. C.E. confirmed that he saw Father at a Culver's restaurant but chose not to approach him and walked the other way. C.E. did not discuss his plans to go to college with Father. While C.E. claimed he was interested in having a relationship with Father during the <u>in camera</u> interview, the trial court found that "[t]his rings hollow and is highly suspect." Appellant's App. at 20. We cannot reassess the credibility of the witnesses. See <u>Staresnick</u>, 830 N.E.2d at 134. Also, the evidence indicates that after C.E. made this claim and Father responded by sending C.E. a certified letter with his contact information, C.E. made numerous excuses and did not follow through with plans to meet Father. This evidence is sufficient to support a finding that C.E. refused to participate in a relationship with Father.

Mother also contends that other cases that have found repudiation involved behavior "far more egregious." Appellant's Brief at 19. However, a review of the cases cited by Mother reveals that this court will affirm a trial court's decision regarding repudiation as long as there is evidence in the record that supports it. See <u>Lechien v. Wren</u>, 950 N.E.2d 838, 844 (Ind. Ct. App. 2011) (affirming the trial court's finding that the son had repudiated his relationship with his father based upon a review of the evidence and testimony most favorable to the judgment); <u>Scales v. Scales</u>, 891 N.E.2d 1116, 1120 (Ind. Ct. App. 2008)

(finding that the trial court did not abuse its discretion when it found that two children had repudiated their relationship with their mother because the evidence presented was sufficient to support the trial court's decision); Norris, 833 N.E.2d at 1033-35 (holding that the evidence supported the trial court's finding that the child had repudiated her relationship with her father; even though the repudiation commenced when she was a minor, "it continued uninterrupted after she reached majority"); Staresnick, 830 N.E.2d at 134 (affirming the trial court's finding that the son had not repudiated his father); cf. Redd v. Redd, 901 N.E.2d 545, 552 (Ind. Ct. App. 2009) (finding that the trial court's finding concerning repudiation was not supported by the evidence). Because there is evidence in the record that supports the trial court's judgment, any factual differences between the case here and other cases are irrelevant.

As Mother indicates, Father may not have been very diligent in attempting to reestablish a relationship with C.E. throughout the years. However, there is evidence in the record that C.E. did not want such a relationship. In recognizing repudiation as a defense to the payment of college expenses, this court has noted that there is no absolute duty on a parent to send his or her child to college and that this must ordinarily be earned by the child himself. McKay, 644 N.E.2d at 167 (quoting Milne, 556 A.2d at 865) (adult children who have abandoned a parent "may decide that the time is ripe for reconciliation. They will not, in any event, be allowed to enlist the aid of the court in compelling that parent to support their educational efforts unless and until they demonstrate a minimum amount of respect and consideration for that parent."). And while the bad feelings between C.E. and Father began

11

when C.E. was eleven years old and may have started with Mother and then filtered through to C.E., see id. at 167 (quoting Milne, 556 A.2d at 861) (noting that "one can understand" how a child of divorced parents' biases and resentments "got that way"), considering the evidence most favorable to the judgment, we cannot say the trial court abused its discretion by finding that C.E., now over eighteen years of age, repudiated his relationship with Father. Thus, the trial court did not err when it denied Mother's request for contribution from Father towards C.E.'s college expenses.

### III. Child Support Calculation

In Indiana, a child support order and an educational support order are separate and distinct. Knisely v. Forte, 875 N.E.2d 335, 340 (Ind. Ct. App. 2007). Here, the trial court refused to enter an educational support order for college expenses due to C.E.'s repudiation of Father. Repudiation is not a defense, however, to an order for child support, Bales, 801 N.E.2d at 199, and the trial court found that Father was obligated to pay child support through July 1, 2012.[5] The trial court's child support calculation for the time C.E. was in college required Father to pay child support throughout the year, even though C.E. only lived with Mother for sixteen weeks of the year. Father argues that this vitiates the trial court's repudiation ruling, because by requiring him to pay child support for the time his son was living on campus, he was in essence contributing to his son's college expenses. Whether a child support order should be reduced for the time a child is living on campus when a court

---

[5] Under current Indiana law, a parent, generally, has a duty to support his or her child until the child reaches nineteen years of age. Ind. Code § 31-16-6-6(a). Until 2012, however, the presumptive age of termination of child support was twenty-one years. July 1, 2012, was the date the new law, changing the age

12

has found that the child has repudiated the non-custodial parent, and on that basis refused to enter an educational support order, is an issue of first impression.

When a trial court enters both an educational support order and a child support order, as it has the discretion to do, child support must be reduced for the expenses that are "duplicated by the educational support order." Ind. Code § 31-16-6-2(b)(1). When both orders are entered, the Indiana Child Support Guidelines specifically require a reduction in child support for the time the child is living away from home for college. See Support Guideline 8(b) ("The impact of an award of post-secondary educational expenses is substantial upon the custodial and non-custodial parent and a reduction of the Basic Child Support Obligation attributable to the child in question will be required when [t]he child resides on campus or otherwise is not with the custodial parent."). The post-secondary education worksheet takes into account how many weeks during the year the child is living with the custodial parent and holds the non-custodial parent responsible for child support for only that number of weeks. See Support Guideline 8(c). The amount is then annualized to avoid weekly variations. Id. Thus, it is clear that while a court may order college expenses and child support, living expenses for a child living on campus should be included in the educational support order and not in the child support order.

We hold that living expenses for a child living on campus should similarly not be included in the child support order when, as here, the child has repudiated the parent and the parent is therefore not required to contribute to the child's post-secondary education. To hold

---

from twenty-one to nineteen, took effect. At the time, C.E. was twenty years old.

13

otherwise would render repudiation no longer a complete defense to the payment of college expenses. We do not adopt a bright-line rule requiring the filing of both a child support obligation worksheet and a post-secondary education support worksheet because no educational support order has been entered. Cf. Child Support Guideline 8(c) (the post-secondary education worksheet along with the child support obligation worksheet "must be filed with the court" when both a child support order and educational support order are entered). But the trial court must reduce child support for the time the child will be living away from home for college. Cf. Lechien, 950 N.E.2d at 847 (holding that the non-custodial parent was required to pay child support year round, despite the child's repudiation, because the child lived at home and not on campus). Because the trial court erred in its child support calculation, we reverse its order modifying child support and remand with instructions to re-calculate child support so that Father does not pay child support for the time C.E. was living on campus.

## Conclusion

The trial court did not abuse its discretion by denying Mother's request for contribution from Father towards C.E.'s college expenses based on its finding that C.E. repudiated Father. However, the court erred in its child support calculation by requiring Father to pay child support for the time C.E. was living on campus. Accordingly, we affirm in part, reverse in part, and remand with instructions to the trial court to re-calculate child support in a manner consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

14

FRIEDLANDER, J., and CRONE, J., concur.