

FILED

Mar 12 2024, 8:48 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Alexander N. Moseley
Julie C. Dixon
Dixon & Moseley, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
JOSEPH TODD WELLS

Jonathan R. Deenik
Deenik Lowe, LLC
Greenwood, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Brooke Wells,
*Appellant-Intervenor,*

v.

Joseph Todd Wells,
*Appellee-Petitioner,*

and

Kimberly Renay Wells,
*Appellee-Respondent.*

March 12, 2024

Court of Appeals Case No.
23A-DR-990

Appeal from the
Marion Superior Court

The Honorable
Danielle Gaughan, Judge

Trial Court Cause No.
49D15-0904-DR-18395

**Opinion by Judge Foley**
Judge Pyle concurs and Judge Tavitas dissents with opinion.

**Foley, Judge.**

Brooke Wells ("Daughter") challenges the sufficiency of the evidence supporting the trial court's finding that she repudiated her father, Joseph Todd Wells ("Father"), and therefore Father was relieved of his obligation to pay for her to attend college. Concluding that the trial court did not clearly err in finding that Daughter repudiated Father, we affirm the trial court.

## Facts and Procedural History

Daughter is the child of Father and Kimberly Renay Wells ("Mother"),[1] whose marriage was dissolved in 2010. Under the dissolution decree, which incorporated the terms of a marital settlement agreement, Father was obligated to pay for Daughter to attend college. In July 2021, Father initiated the instant litigation by filing a petition for the emancipation of Daughter, who turned eighteen earlier that year. Daughter intervened, filing a motion to enforce the provisions of the dissolution decree that required Father to pay for her college education. Father then filed a petition alleging that Daughter had repudiated him, asking the trial court to either (1) relieve him of the obligation to pay for Daughter's college education or (2) modify the dissolution decree.

A fact-finding hearing was held in December 2022. Evidence was presented that Daughter—who was born on March 5, 2003—was completing her senior year of high school in the spring of 2021. As of her junior year, Daughter's plan was to join the Air Force. Before spring break of her senior year, Daughter had

---

[1] Mother does not participate on appeal.

taken a physical and received a special assignment. Daughter went on spring break with her boyfriend, Bryce Bowen, and his family. During the trip, she confided in Bryce's mother, telling her she did not want to go into the Air Force.

[4] Before spring break, Daughter generally had a positive relationship with Father and his wife ("Stepmother"), with whom Daughter lived. When Daughter returned from spring break, she informed Father by text message that she no longer wished to go into the Air Force. Father and Stepmother then attempted to speak with Daughter about her options. At that point, Father was under the impression that Daughter had not submitted college applications. However, Daughter had in fact submitted college applications, but she did not tell Father because she thought he would be upset due to having other plans for Daughter.

[5] The issue of Daughter's post-secondary plans resulted in family conflict and the deterioration of Daughter's relationships with Father, Stepmother, and Daughter's older brother ("Brother"). In May 2021—by which point Daughter was eighteen years old, but still in high school—Daughter abruptly moved out of Father's home and moved in with the Bowens. Daughter did not discuss this decision with Father. Father wanted Daughter to move back into his home, where Daughter's clothing, bedding, and other personal belongings were available to her. Although Father thought Daughter might move back within a week or so, Daughter continued living with the Bowens, who purchased clothing, bedding, and other items for her. When Daughter began attending community college at Ivy Tech, it was the Bowens who paid the tuition. Since

moving out in May 2021, Daughter returned twice to gather personal belongings. In the ensuing months, Father and Stepmother invited Daughter to attend family events and sit for a family portrait. Daughter did not attend events where Father was present, and she did not come for the family portrait.

[6] Since May 2021, Father has physically seen Daughter on three occasions: (1) her high school graduation; (2) an appointment for the extraction of Daughter's wisdom teeth, where Father paid for the procedure; and (3) a brief luncheon. In November 2021, Father became seriously ill and was hospitalized. Daughter did not visit Father, and she engaged in only minimal communications about his health. As Daughter attended community college and later enrolled at Indiana University, Daughter did not provide Father with specific information regarding the costs of attendance, the classes she was taking, or her grades. Although Father would periodically send Daughter text messages, and Daughter would sometimes respond—at times expressing well-wishes and telling Father she loved and missed him—Father testified that Daughter's actions belied her words. Father ultimately testified that he believes Daughter "doesn't have the desire to have a relationship" with him. Tr. Vol. 3 p. 14.

[7] The trial court took the matter under advisement. It later entered sua sponte findings and conclusions, writing that Daughter "repudiated her relationship with Father and Father is therefore relieved of his obligation to contribute to [Daughter's] college expenses." Appellant's App. Vol. 2 p. 27. Daughter moved to correct error, claiming the judgment was "contrary to relevant case law on repudiation and post-secondary educational support orders." *Id.* at 131.

Daughter challenged several of the court's findings, and she sought relief due to the alleged "misinterpretation of relevant case law, or a mistake having been made[.]" *Id.* at 147. The trial court denied the motion. Daughter now appeals.

## Discussion and Decision

[8] Daughter appeals the denial of her motion to correct error. That motion challenged the trial court's determination that Daughter repudiated Father and, therefore, Father was relieved of his obligation to pay for her college expenses.

We review the denial of a motion to correct error for an abuse of discretion. *Berg v. Berg*, 170 N.E.3d 224, 227 (Ind. 2021). Under this standard, we "only reverse 'where the trial court's judgment is clearly against the logic and effect of the facts and circumstances before it or where the trial court errs on a matter of law.'" *Id.* (quoting *Perkinson v. Perkinson*, 989 N.E.2d 758, 767 (Ind. 2021)). However, to the extent the ruling turns on a question of law, our review is de novo. *Id.* Furthermore, where—as here—the trial court entered sua sponte findings, those findings control only "the issues or matters covered thereby[.]" Ind. Trial Rule 52(D). As to other issues, "the judgment or general finding . . . shall control[.]" *Id.* Under Trial Rule 52(A), we "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." A finding is clearly erroneous only if the record contains no facts to support the finding, either directly or by inference. *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997). "A judgment is clearly erroneous if it applies the wrong legal

standard to properly found facts." *Id.* We ultimately look to whether the evidence supports the findings and the findings support the judgment. *Id.* In doing so, "we neither reweigh the evidence nor assess the credibility of witnesses, but consider only the evidence most favorable to the judgment." *Staresnick v. Staresnick*, 830 N.E.2d 127, 131 (Ind. Ct. App. 2005), *trans. denied*. We will affirm unless our review leaves us "with the firm conviction that a mistake has been made." *Yanoff*, 688 N.E.2d at 1262.

[9] "[W]here a child, as an adult over eighteen years of age, repudiates a parent, that parent must be allowed to dictate what effect this will have on his or her contribution to college expenses for that child." *Lovold v. Ellis*, 988 N.E.2d 1144, 1150 (Ind. Ct. App. 2013) (quoting *McKay v. McKay*, 644 N.E.2d 164, 168 (Ind. Ct. App. 1994)). Repudiation is the "complete refusal to participate in a relationship with the parent" after the child turns eighteen. *Lovold*, 988 N.E.2d at 1150. In relieving a parent of the obligation to pay for college expenses upon the child's repudiation, we emphasized that, "[b]y college age, children of divorced parents must be expected to begin to come to terms with the reality of their family's situation. They must begin to realize that their attitude and actions are their individual responsibilities." *Messner v. Messner*, 118 N.E.3d 64, 68–69 (Ind. Ct. App. 2019) (quoting *McKay*, 644 N.E.2d at 166), *trans. denied*. Thus, "[w]hatever their biases and resentments"—even if "one can understand how they got that way"—"when they become adults it is no longer appropriate to allow them to stay that way without consequence." *Id.* (emphasis removed).

[10]     Although not raised by the parties, the dissent would hold that the doctrine of repudiation is not available to Father because Father's obligation to contribute to Daughter's educational expenses was included in a marital settlement agreement. Critically, however, a parent's obligation to contribute to the educational expenses of a child is not found at common law but, instead, arises solely from our dissolution of marriage statutes. *See* I.C. § 31-16-6-2. And, similar to a child support order, an educational support order is subject to modification. *See generally Svenstrup v. Svenstrup*, 981 N.E.2d 138, 145 (Ind. Ct. App. 2012) ("Generally, provisions for the payment of educational expenses are . . . modifiable because educational expenses are in the nature of child support."); *see also Panfil v. Fell*, 19 N.E.3d 772, 778 (Ind. Ct. App. 2014) (involving circumstances where "the dissolution decree incorporated an agreement of the parties" requiring one parent to pay "one-third of [the child's] expenses for . . . college education," and the trial court "later modified its order to condition [the] support obligation" on, among other things, the maintenance of a certain GPA), *trans. denied*. We find no proper basis to limit the doctrine of repudiation to instances where the provision of educational expenses was a contested matter—particularly in this instance, where more than ten years have passed since the original agreed entry.[2] We therefore proceed to address Daughter's challenges to the trial court's findings and judgment.

_____

[2] To the extent the dissent expresses concerns about the repudiation doctrine itself—suggesting that this doctrine "opens the door to damaging parent-child relationships," *infra* p. 24—those types of public policy

[11] Daughter challenges the trial court's ultimate determination that "[Daughter] has repudiated her relationship with Father[.]" Appellant's App. Vol. II p. 27. She specifically challenges four underlying findings, including the finding that she "failed to attend a counseling session on May 17, 2021, as the parties had agreed to in a Partial Mediated Agreed Entry that was approved by the Court on September 28, 2022." *Id.* at 26. Daughter points out that she could not have been subject to an agreed entry in May 2021, which was well before the litigation commenced. Regardless, it is well-settled that "[s]pecial findings, even if erroneous, do not warrant reversal if they amount to mere surplusage and add nothing to the trial court's decision." *Bell v. Clark*, 653 N.E.2d 483, 489 (Ind. Ct. App. 1995), *expressly adopted*, *Bell v. Clark*, 670 N.E.1290, 1294 (Ind. 1996). Here, we conclude that this challenged finding amounts to surplusage. We focus on specific findings regarding Daughter's relationship with Father.

[12] Daughter challenges the following finding regarding whether Daughter was meaningfully engaged with the family after moving out of Father's residence:

> The communication between Father and [Daughter] has been by Facebook Messenger and text. [Daughter] was invited to several family celebrations by Father and Stepmother and was included in an invitation for a family portrait. [Daughter] failed to show up for any family celebrations and did not respond to the invitations. [Daughter] stated she intended to show up for the

---

concerns are best addressed by our legislature. Moreover, restricting the repudiation doctrine implicates other policy issues in that, if repudiation did not apply whenever a parent initially agreed to educational support, parents might be dissuaded from including this type of support in their settlement agreements.

family portrait but concedes that she did not because she 'lost track of time.'

*Id.* at 26. According to Daughter, "[t]his finding is clearly erroneous to the extent that it states Daughter did not show up for any family celebrations or respond to the invitations." Appellant's Br. p. 13. Daughter points out that she attended at least some "family events during the relevant time period," and she "did respond to Father when he would invite her" to certain events. *Id.* Daughter is correct in that there is, for example, evidence that she attended a Christmas gathering with Mother. At the same time, the evidence indicates that Daughter left early without explanation. In any case, the essence of the challenged finding was that Daughter lacked meaningful engagement with the family, and Father in particular. And there is ample evidence that Daughter withdrew from Father after she moved out, declining to attend family events where he was present. Indeed, there was evidence that Father's door was open to her, but she saw him in person on just three occasions in the eighteen months between the date she moved in with the Bowens and the evidentiary hearing.

[13] Daughter also challenges the trial court's finding that she "failed to include either of her parents in her college choices or provide either of them with meaningful information regarding costs, classes, or grades." *Id.* Daughter directs us to evidence that she alerted Father when she was accepted to Indiana University, that she and Father briefly discussed student loans, and she "was sending information to Father as early as April of 2021 regarding schools she would like to attend, as well as attempting to discuss financial information." *Id.*

at 14. In challenging the foregoing finding, Daughter focuses on the evidence favorable to her. However, she omits evidence indicating that Father was concerned that Daughter was making a rash decision about post-secondary plans, after suddenly abandoning her plans to go into the Air Force. Father testified that, although Daughter "changed her mind overnight," he was ultimately supportive of Daughter's decision to go to college. Tr. Vol. 2 p. 91. He "wanted the best for [Daughter]" and, by the end of May 2021, "was trying to figure out how [the family could] get [Daughter] to college," but Daughter would not participate in a "deliberate, thoughtful" planning process or abide by Father's basic rules for living in his home as a college-bound adult. *Id.* at 94.

[14] Daughter also challenges the following finding:

> [Daughter] has repudiated her relationship with Father and has rejected Father's efforts to reconcile their relationship. There is no question that [Daughter] could have returned to Father's home at any time after she left on May 12, 2021, in the final semester of her senior year of high school. Unlike the fact patterns in case law regarding repudiation where the child is usually in the home of the custodial parent and is alleged to have repudiated the non-custodial parent, [Daughter] has repudiated both of her parents and even separated herself from her older brother, to whom she was once close.

Appellant's App. Vol. II p. 26. As to this finding—and other related findings that Daughter has repudiated her relationship with Father—Daughter seems to acknowledge that the parent-child relationship was severely strained. However, she maintains that there is insufficient evidence that she completely refused to

participate in the relationship so as to support a finding of repudiation. She asserts that, "from a practical standpoint, it is understandable why Daughter would not want to move back in with Father while there was pending litigation between [them], as it surely would have created a tense situation." Appellant's Br. p. 16. She asserts that "[a]n adult child's decision to move out of [her] parent's home cannot lead to an inference that [she] no longer wants a relationship with that parent." *Id.* Daughter generally directs us to the evidence most favorable to her position, focusing on evidence that she loved Father and "desir[ed] to have a relationship" with him. *Id.* at 21. Daughter ultimately claims that "the testimony presented at the final hearing[] prohibits a finding that Daughter repudiated her relationship" with Father. *Id.*

[15] Daughter characterizes the strain in the parent-child relationship as merely a "rough patch," *id.* at 22, and she directs us to *Redd v. Redd*, 901 N.E.2d 545, 552 (Ind. Ct. App. 2009), where this Court reversed a finding of repudiation. We note, however, that family law cases involving the alleged repudiation of a parent-child relationship are especially fact-intensive, and we are not at liberty to reweigh the evidence. Furthermore, since *Redd* was decided, our Supreme Court has repeatedly "expressed the importance of appellate deference in family law matters[.]" *D.C. v. J.A.C.*, 977 N.E.2d 951, 956 (Ind. 2012). Critically, the trial court has the "unique" opportunity to have "direct interactions with the parties"—often "over an extended period of time." *Id.* (quoting *Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011)). But "appellate courts 'are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who

saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence.'" *Id.* (quoting *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002)).

[16] Here, there is evidence that, although Daughter periodically corresponded with Father through written messages, she was at times "manipulative" and her engagement was insincere. Tr. Vol. 3 p. 84. Father emphasized that "actions speak louder than words." *Id.* at 90. He pointed to Daughter's lack of meaningful communication when he was hospitalized on multiple occasions. It was ultimately Father's position that Daughter wanted him to pay for college, but without collaborating with him to form a thoughtful plan for her career.

[17] Whereas the dissent concludes that "nothing in the record supports a finding that Daughter ha[d] completely rejected a relationship with Father," in light of the foregoing evidence, we respectfully disagree. *Infra* p. 24. All in all, the doctrine of repudiation contemplates intervening acts of the child to sever the parent's duty to contribute to educational expenses, and this case involved conflicting evidence regarding the status and prognosis of the parent-child relationship. Under the circumstances, we must adhere to our standard of review and defer to the trial court, which was in the best position to assess witness credibility and make a factual determination regarding Daughter's intended relationship with Father. *Cf. D.C. v. J.A.C.*, 977 N.E.2d 951, 956 (Ind. 2012) (emphasizing "the importance of appellate deference in family law matters").

[18] As we have recognized, "[b]y college age, children of divorced parents must be expected to begin to come to terms with the reality of their family's situation. They must begin to realize that their attitude and actions are their individual responsibilities." *Messner*, 118 N.E.3d at 68–69. Indeed, "[w]hatever their biases and resentments"—even if "one can understand how they got that way"—"when they become adults it is no longer appropriate to allow them to stay that way without consequence." *Id.* (emphasis removed). And "where a child, as an adult over eighteen years of age, repudiates a parent, that parent must be allowed to dictate what effect this will have on his or her contribution to college expenses for that child." *Lovold*, 988 N.E.2d at 1150 (quoting *McKay*, 644 N.E.2d at 168). In this case, the record discloses clear and convincing evidence that Daughter repudiated Father thereby relieving Father of the obligation to pay for college. *See, e.g.*, Tr. Vol. 3 p. 14 (involving testimony that Daughter "doesn't have the desire to have a relationship" with Father). Declining to reweigh the evidence, we affirm the trial court.

[19] Affirmed.

Pyle, J., concurs.

Tavitas, J., dissents with opinion

**Tavitas, Judge, dissenting.**

[20] I respectfully dissent from the majority's decision to affirm the trial court's determination that Father is not required to pay for Daughter's college expenses because she repudiated her relationship with Father. First, the repudiation doctrine should not even apply to Father because he agreed to pay for all of Daughter's college expenses in the settlement agreement between Father and Mother during the dissolution of their marriage. And, even if the repudiation doctrine could apply in such situations, the evidence does not support the trial court's determination that Daughter completely repudiated her relationship with Father.

## *I. Repudiation Should Not Apply to Settlement Agreements*

[21] When Father and Mother divorced, they entered into a settlement agreement. In this agreement, Father agreed to pay for 100 percent of Daughter's college expenses. Because Father agreed to pay for Daughter's college expenses, I am not convinced that the doctrine of repudiation should even apply.

[22] The doctrine that a child's repudiation of a parent could relieve that parent of the obligation to pay for college expenses was first adopted by this Court in *McKay v. McKay*, 644 N.E.2d 164 (Ind. Ct. App. 1994). In that case, we noted the general rule that "there is no absolute legal duty on the part of parents to provide a college education for their children." *Id.* at 166 (citing *Neudecker v. Neudecker*, 577 N.E.2d 960, 962 (Ind. 1991)). We then observed:

> However, the statutory authorization for the divorce court to order either or both parents to pay sums toward their child's college education constitutes a reasonable manner in which to enforce the expectation that most families would encourage their qualified children to pursue a college education consistent with individual family values. In determining whether to order either or both parents to pay sums toward their child's college education, the court must consider whether and to what extent the parents, if still married, would have contributed to the child's college expenses.

*Id*. (citations omitted). Thus, a court may require parents to contribute to their child's college expenses if, had the parents remained married, they would have contributed to such expenses. Importantly, however, the *McKay* Court also held, "[t]he expectation that a parent would ordinarily be inclined to contribute toward his child's college education (which may be enforced under our laws of dissolution) does not continue, and should not be enforced where an adult child has repudiated his relationship with his parent." *Id*. at 168.

[23] Although our Supreme Court has never addressed the repudiation doctrine, this Court has repeatedly done so. A review of these cases reveals that a vast majority dealt with situations in which a parent was ordered to pay for their child's college expenses, not where the parent had already agreed to do so. *See Cunningham v. Barton*, 139 N.E.3d 1081, 1086 (Ind. Ct. App. 2019) (trial court granted petition to require parent to pay for college expenses); *Duncan v. Duncan*, 81 N.E.3d 219, 222 (Ind. Ct. App. 2017) (same); *In re Paternity of Pickett*, 44 N.E.3d 756, 761 (Ind. Ct. App. 2015) (same); *Staresnick v. Staresnick*, 830 N.E.2d 127, 128 (Ind. Ct. App. 2005) (same); *Loden v. Loden*, 740 N.E.2d

865, 869 (Ind. Ct. App. 2000) (same); *Thacker v. Thacker*, 710 N.E.2d 942, 946 (Ind. Ct. App. 1999) (same); *McKay*, 644 N.E.2d 164 (same); *see also Messner v. Messner*, 118 N.E.3d 64, 66 (Ind. Ct. App. 2019) (trial court denied petition to require parent to pay for college expenses); *Lovold v. Ellis*, 988 N.E.2d 1144, 1146 (Ind. Ct. App. 2013) (same); *Lechien v. Wren*, 950 N.E.2d 838, 841 (Ind. Ct. App. 2011) (same); *Redd v. Redd*, 901 N.E.2d 545, 549 (Ind. Ct. App. 2009) (same); *Scales v. Scales*, 891 N.E.2d 1116, 1118 (Ind. Ct. App. 2008) (same).

[24] In contrast, I have found only three cases in which we addressed a claim of repudiation of a parent where the parent had agreed to pay for college expenses. *See Himes v. Himes*, 57 N.E.3d 820 (Ind. Ct. App. 2016) (mediated agreement); *Norris v. Pethe*, 833 N.E.2d 1024, 1035 (Ind. Ct. App. 2005) (settlement agreement); *Cure v. Cure*, 767 N.E.2d 997, 999 (Ind. Ct. App. 2002) (settlement agreement).

[25] Only in *Norris* did we hold that the daughter's complete repudiation of her father relieved the father of his agreed-to obligation to pay for college expenses. 833 N.E.2d at 1034–35. In *Cure*, we held that the child did not repudiate her relationship with her father and did not directly address whether such repudiation, if found, could relieve the father of his obligation to pay for college expenses. 767 N.E.2d at 1002–03. And in *Himes*, the father moved to modify the mediated agreement in which he agreed to contribute to his daughter's college expenses. 57 N.E.3d at 828. The trial court denied this motion, and we affirmed. *Id*. We concluded that the father did not demonstrate "a change[] in

circumstances as substantial and continuing as to make Father's agreed contribution unreasonable." *Id.* at 829. We noted, however,

> Indiana's policy is to encourage parents to settle their own affairs. *Reno v. Haler*, 734 N.E.2d 1095, 1100 (Ind. Ct. App. 2000), *trans. denied*. We have previously pointed out that a child support order and an educational support order are separate and distinct because an educational support order can be terminated if a child repudiates a parent. *Lovold*[, 988 N.E.2d at 1152]. We do not have that here. What we do have here are two parents that properly executed a mediated agreement, which stated that they both gave up any "right to revoke their signature or the effectiveness of this Mediated Agreement." There is no evidence in the record of fraud, duress, misrepresentation, or manifest inequities. *See Pond v. Pond*, 700 N.E.2d 1130, 1136 (Ind. 1998). As a result, even if there was evidence to support a modification, it is likely that the trial court would still have been bound to enforce the terms of the parties' Mediated Agreement. However, we do not reach that conclusion today.

*Hines*, 57 N.E.3d at 829 n.1 (record citation omitted).

[26] Here too, the trial court did not enter an education support order. Instead, Mother and Father freely entered into a settlement agreement in which Father agreed to pay 100 percent of Daughter's college expenses. The only conditions placed on Father's obligation to pay for college expenses are that Daughter remain a full-time student and maintain at least a C grade average. Appellant's App. Vol. II p. 36. The settlement agreement also contains an integration clause and further states that the terms of the agreement could not be modified except by written agreement of the parties. *Id.* at 42.

[27] Given these facts, a parent should not be able to escape their freely-bargained-for obligation to contribute to their child's college expenses. *McKay* and its progeny only stand for the proposition that, when one parent seeks a court order requiring the other parent to contribute toward their child's college expenses, the latter cannot be required to do so when the child has completely refused to have a relationship with that parent. This is simply not the case here.

[28] Here, Father **agreed** to pay 100 percent of Daughter's college expenses as part of the settlement agreement. Clearly, Mother and Father negotiated this financial obligation as part of the overall financial settlement. This term of the settlement agreement is not conditioned on Father's desire or ability to pay. Father agreed to assume all responsibility. Father should be held to his end of the bargain. *See Himes*, 57 N.E.3d at 829 n.1.

[29] Furthermore, I am concerned about the potential for damage to parent-child relationships if we allow a parent to cause the very conflict that results in the alleged "repudiation" by exploiting child's desire to go to college knowing her parents had agreed to this at the time of their divorce. Children are greatly affected by divorce, and to allow a parent to "repudiate" an agreed-upon term of their settlement agreement that was negotiated for a child gives the parent the ability to renege on their obligations. Here, the source of the conflict between Father and Daughter is Father's refusal to pay for Daughter's college expenses, despite his agreement to do so. By permitting Daughter's understandable frustration at this refusal to form the basis of a "repudiation" finding allows Father to benefit from his obstinance.

## II. Insufficient Evidence of Repudiation

[30] Even if I agreed with the majority that the repudiation doctrine could apply in situations where a parent has entered into an agreement to pay for college expenses, the evidence does not support the trial court's determination that Daughter repudiated her relationship with Father. As the majority notes, "[r]epudiation of a parent is 'a **complete refusal** to participate in a relationship with his or her parent.'" *Redd*, 901 N.E.2d at 550 (quoting *Norris*, 833 N.E.2d at 1033) (emphasis added); *see also McKay*, 644 N.E.2d at 165 (holding that trial court erred by ordering father to pay for son's college expenses even though the son had "steadfastly refused to have any relationship with [f]ather despite [f]ather's on-going efforts to reconcile their relationship"). In fact, the word "repudiate" is defined to mean "[t]o disown (a child, for example)," and "[t]o refuse to have any dealings with." *Repudiate*, American Heritage Dictionary (5th ed. 2022); *see also Repudiate*, Dictionary.com (defining "repudiate" as "to cast off or disown.").

[31] In the present case, the facts most favorable to the trial court's judgment show that Daughter's relationship with Father became strained after, contrary to her earlier plans, Daughter decided not to enlist in the United States Air Force—a decision with which Father vehemently disagreed. This culminated in her moving out of Father's home and into the home of her boyfriend's parents. Thereafter, Daughter's in-person communications with Father were minimal.

[32] Undisputed evidence in the record, however, shows that Father and Daughter still had significant communication during this period. Indeed, in his brief,

Father "concedes that there was a significant amount of communication as demonstrated by the exhibits presented to the trial court." Appellee's Br. p. 9. Father claims, however, that this evidence also shows that, although he sent daughter hundreds of messages, she responded to only approximately forty percent of his messages. At a minimum, however, this demonstrates that Father and Daughter still had significant communication after she moved out.

[33] Moreover, in these messages, Daughter repeatedly stated that she loved Father and wanted a relationship with him. *See, e.g.*, Ex. Vol. II pp. 10 (Daughter messaging Father, "Happy birthday dad. I love you. ❤️ I just want you to know that I haven't stopped loving and I never will. I hope one day we can have a close relationship. I hope you have a great day. Love you."); *id.* at 14 ("Dad I never wanted to do any of this. I love you so much and the family. I miss everyone so much. . . . [Y]ou're crazy if you think I abandoned the family and that I wanted to leave. I did what I had to in order for me to have a future. I'm doing this because it was already an agreement and I deserve to get what [brother] got. . . . I love you dad and I will never stop."); *id.* at 70–71 ("Just know you will see me again. One day I will prove you wrong and make something out of myself. I hope you . . . can find it in your heart to come to my grad party.") (errors in originals).

[34] I do not deny that the parties' relationship is strained and that the communication between the parties is not entirely amicable. I simply do not find, however, that Daughter's actions evidence a "complete refusal" to participate in a relationship with Father. *Redd*, 901 N.E.2d at 550.

[35]     Although the parental-repudiation determination is necessarily fact sensitive, a review of cases in which we affirmed a finding of parental repudiation shows that those cases were quite different than the present case. For example, in *Lovold*, we held that the evidence was sufficient to support the trial court's determination of parental repudiation. 988 N.E.2d at 1151. There, when the son was younger, he did not see his father for eight years and did not contact father in any way. *Id.* This behavior continued after son was eighteen years of age. Although the son claimed during an in-camera interview that he was interested in having a relationship with his father, the trial court determined that this statement was not worthy of credit. *Id.* The son still refused to meet with his father after receiving his father's contact information. Accordingly, we held that the evidence supported a finding that the son refused to participate in a relationship with his father. *Id.*

[36]     In *Norris*, the daughter rejected her father's birthday gifts and returned them to him; she also only communicated with her father to tell him that she did not want to have a relationship with him. 833 N.E.2d at 1034. When the father went to one of his daughter's school events, she told him to leave. *Id.* The daughter also stated that she did not want her father to attend her graduation. *Id.* The daughter in *Norris* even stated that she would not visit her father if he were dying. Under those circumstances, we affirmed the trial court's repudiation determination. *Id.* at 1035.

[37]     Lastly, in *McKay*, 644 N.E.2d at 165, the father voluntarily relinquished his visitation rights with his son after their relationship soured. Although he did

not exercise his visitation, the father did occasionally send his son gifts and cards. *Id*. Years later, the father tried to reconcile with his son and attempted to reinstate his visitation rights. *Id*. This resulted in court-ordered counseling, after which the son still refused to have anything to do with his father. *Id*. The son testified that he desired no relationship or contact with his father and that he considered his mother and stepfather to be his parents. *Id*. at 166. On appeal from the trial court's order requiring the father to pay a portion of the son's college expenses, we held that the son had repudiated his relationship with his father and reversed. *Id*. at 168.

[38]     In contrast, in *Tew v. Tew*, 924 N.E.2d 1262, 1269 (Ind. Ct. App. 2010), we affirmed the trial court's determination that the daughter did not repudiate her relationship with her father. In that case, the daughter had not had an overnight visit with her father, but she did participate in group visits that included her father, grandmother, and brother. *Id*. She also attended a birthday dinner with her father. We concluded, therefore, that "the record does not support a showing that [the daughter] ha[d] exhibited a complete refusal to engage in a relationship with [her father]." *Id*.

[39]     In *Redd*, *supra*, the son's behavior toward his mother was described by the trial court as "deplorable and included defiance, physical threats, open scorn and repudiation of her authority as a mother." 901 N.E.2d at 552. Despite this, the son attended the graduation party his mother's family threw for him. *Id*. The mother also spoke with her son on the phone when he would answer. *Id*. The son also told both his parents that he wished to have a relationship with his

mother. *Id.* Yet the son also stated that he hated his mother and wanted nothing to do with her and never wanted to see her again. *Id.* "[D]espite these statements, [son] called [m]other the night before the hearing and asked if he could see her," and when the mother agreed, the son acted like "nothing had happened." *Id.* After this meeting, however, the mother thought that she would never speak with her son again. *Id.* Given those facts, we nevertheless held that the son did not repudiate his relationship with his mother. *Id.* "While we certainly d[id] not condone [the son]'s deplorable behavior, [he] ha[d] not completely rejected a relationship with his [m]other." *Id.* We therefore reversed the trial court's determination and noted that "repudiation occurs only when the child completely rejects a relationship with the parent in question." *Id.*

[40] And in *Staresnick v. Staresnick*, 830 N.E.2d 127 (Ind. Ct. App. 2005), we affirmed the trial court's determination that the son had not repudiated his relationship with his father. In that case, the son expressed a desire to have a relationship with his father and was even amenable to counseling. The son did not consult with his father in making decisions regarding his post-secondary education, nor did he inform his father of his address at college. The son also had only two telephone conversations with his father during a two-year period and had told his father more than once that he did not respect him and no longer wished to see him. *Id.* at 132–33. Still, we affirmed the trial court's finding of non-repudiation because the son indicated a willingness to rebuild his relationship with his father. *Id.*

[41] The facts of this case align more with those in *Tew*, *Redd*, and *Staresnick* than *Lovold*, *Norris*, or *McKay*. That is, Daughter and Father have a strained relationship, and some of Daughter's behavior has been, admittedly, disrespectful. But nothing in the record supports a finding that Daughter has completely rejected a relationship with Father.

### Conclusion

[42] The repudiation doctrine only applies when a child completely repudiates his or her relationship with a parent. To hold otherwise incentivizes parents to create situations that can lead to strained relationships in an effort to avoid a bargained-for obligation under the guise of repudiation. I fear that the majority's holding opens the door to damaging parent-child relationships. The fragility of teenage relationships with divorced parents has received another blow with the majority's holding. Moreover, the evidence does not support a determination that Daughter has repudiated her relationship with Father here.

[43] For these reasons, I would reverse the trial court's repudiation determination.